605 So.2d 622 (1992)
Norma J. ARANT, et al., Plaintiff-Appellee,
v.
ST. FRANCIS MEDICAL CENTER, INC., et al., Defendant Appellant.
Norma J. ARANT, et al., Plaintiff-Appellee,
v.
J. Michael CAGE, M.D., Donald W. Fulton, M.D., & Louisiana Medical Mutual Insurance Company, Defendants-Appellants.
Nos. 23402-CA, 23403-CA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1992.
Writ Denied November 30, 1992.
*623 Hayes, Harkey, Smith, Cascio & Mullens by Haynes L. Harkey, Jr., Thomas M. Hayes, Jr., Monroe, for defendant-appellant St. Francis Medical Center, Inc.
Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., Monroe, for defendantsappellants J. Michael Cage, M.D., Donald W. Fulton, M.D., & Louisiana Medical Mut. Ins. Co.
Triche, Sternfels & Nail by Risley C. Triche, Napoleonville, for plaintiffs-appellees.
Before MARVIN, VICTORY and STEWART, JJ.
VICTORY, Judge.
This appeal arises from a medical malpractice controversy in which the primarycare physician and the hospital were assessed with damages for treatment of a patient who died unexpectedly in the hospital following a kidney infarction. The doctor, his insurer, and the hospital appeal, and plaintiffs have answered the appeal seeking to reinstate the jury award on lost wages.
We reverse, and render judgment dismissing plaintiffs' lawsuit.

FACTS
On March 11, 1985, after Cecil Arant (Arant) noticed blood in his urine, he consulted Dr. Michael Cage, a urologist, who him admitted to North Monroe Community Hospital for tests. An intravenous pyelogram showed the right kidney was enlarged and mal rotated. Thinking the source of the problem was a urethral stone, Dr. Cage discharged Arant, prescribed pain medication, and gave him instructions to return if the symptoms reoccurred.
The bleeding stopped for a few days, but reappeared, and Arant returned to the doctor's office on March 15, 1985 where he was examined by Dr. William Liles, Dr. Cage's partner. Dr. Liles performed a cystoscope examination, determined the blood was coming from Arant's right kidney, and admitted him to St. Francis Medical Center (St. Francis) on Sunday, March 17, for further testing.
On Monday, March 18, a CAT-scan showed a probable right hypernephroma with a possible metastatic lesion to the liver. Dr. Cage, suspecting renal cell carcinoma (RCC) of the right kidney with possible metastasis to the liver, which is located on the same side of the body and next to the right kidney, discussed the situation with Arant and obtained his signed consent to perform an arteriogram to determine whether Arant had RCC in his kidney. Arant also agreed to an immediate infarction *624 (killing) of the right kidney if the arteriogram indicated RCC. Dr. Cage explained to Arant that infarcting the kidney would stop the blood flow to the kidney, thus making surgical removal of the kidney on Friday easier and less bloody, and might stimulate the body's immune system to prevent the spread of the suspected cancer. Arant was told to expect excruciating pain and high fever as a result of the infarction.
On Wednesday afternoon, Dr. Donald Fulton, a radiologist, performed an arteriogram on Arant and diagnosed a "classic case" of RCC. After informing Dr. Cage of the test results by telephone, Dr. Fulton was told to proceed with the infarction. This procedure consisted of making an incision in the patient's groin area, inserting a coil into the renal artery, and blocking the blood flow to the kidney. The infarction was performed late Wednesday afternoon without incident, and surgical removal of the right kidney and exploratory surgery of the liver was scheduled for Friday, March 22.
As expected, Arant had fever and severe pain from the kidney infarction, requiring heavy doses of pain medication. On Thursday, early in the afternoon, Arant's temperature increased to over 105°. A nurse on duty telephoned Dr. Cage at 2:10 p.m., and was given orders to administer Tylenol orally and to take "temp measures" to reduce the temperature. The Tylenol and alcohol sponge baths successfully reduced Arant's temperature to 99.5° by 8 p.m. that evening.
However, his temperature again began rising and at 12:35 a.m. on Friday morning the nurses charted his temperature at over 103°. Dr. Cage was contacted by telephone and ordered more Tylenol in suppository form due to a prior restriction that Arant not take anything by mouth prior to surgery scheduled later that day. At about 5:00 a.m., Mrs. Norma Arant testified she noticed her husband's skin was yellow with purple splotches, and questioned the nurse about it, but was told the skin color and condition was to be expected. At about 6:30 a.m. Jimmy Don Teel, Mr. Arant's brother-in-law, arrived and noticed red splotches on Arant's skin and that his breathing was very shallow. He described Arant's condition as "pretty bad."
Dr. Fulton visited Arant at 7:20 a.m. He testified he found nothing unusual in Arant's condition, but lowered the bed from the almost 90° upright position which Mrs. Arant had placed the bed to assist her husband in taking ice by mouth. Dr. Fulton stated at trial he was concerned the upright position was increasing the pressure on Arant's dying kidney, and thus his pain. Mr. Teel testified he and Mrs. Arant told Dr. Fulton of Mr. Arant's skin coloration and shallow breathing, but he did nothing other than adjust the bed.
At approximately 7:42 a.m., only twenty minutes after Dr. Fulton's visit, Arant stopped breathing. Mr. Teel and Mrs. Arant screamed for help. Dr. Christian Ulrich, an internist, heard the screams from across the hall, ran to the room, discovered no heart beat or respiration, and immediately began CPR. A nurse, who had also heard the screams, entered the room and instituted a Code 99 emergency call. Emergency teams from the hospital staff soon arrived, and began administering drugs to stimulate the heart and shocks to the heart through a defibrillator machine. The EKG monitor on the heart showed no signs that the measures taken were effective. The emergency code was discontinued about 8:00 a.m., and Mr. Arant was declared dead by Dr. Ulrich.
Later in the day after Arant's body was embalmed, Dr. Nancy Smith, a pathologist, performed an autopsy and examined the liquified remains of Arant's right kidney and surrounding dead tissue, which weighed 520 grams compared to the normal left kidney which weighed 190 grams. The liver lesion was tentatively identified by Smith as possible RCC spread from the kidney. Later, after talking to Mrs. Arant and being told of a prior melanoma in Arant's eye 15 years earlier, Dr. Smith obtained the slides taken of the eye at that time and identified the liver cancer as a melanoma metastasized from Arant's eye.
Mrs. Arant filed suit in April of 1986 against St. Francis Medical Center, Inc. for alleged malpractice in the death of her *625 husband. She subsequently filed another suit against Dr. Cage, Dr. Fulton, and their professional liability insurer, Louisiana Medical Mutual Insurance Co. (LAMMICO), which was consolidated with the original suit against St. Francis. By amended petitions filed April 3, 1989, over three years after the original petition, the Arant children, Deborah A. Beck, Cecil Glen Arant, Otis Layne Arant, and Janis A. Battaglia, were added as plaintiffs to the litigation. All defendants filed pleas of prescription to the claims of new plaintiffs, which were overruled by the trial judge.
Plaintiffs alleged Dr. Cage diagnosed RCC when Arant did not have it, and that he failed to properly care for his patient after the infarction was performed on Wednesday afternoon. Their complaints about St. Francis included failure to properly monitor Arant's vital signs, failure to notice signs of breathing problems associated with asphyxiation, and failure to properly maintain a defibrillator used during the Code 99.
After several days of trial, the jury, by a vote of 9-3, found Dr. Fulton was not at fault, found Dr. Cage to be 70% and St. Francis to be 30% at fault in Arant's death, and awarded the following damages:

Funeral expenses $ 5,558.00
Past lost earnings $153,600.00
Future lost earnings $105,000.00
Physical pain, suffering and mental anguish of Mr. Arant $100,000.00
Loss and deprivation of companionship, love and affection and
mental anguish to:
Mrs. Norma Arant $100,000.00
Deborah Arant Beck $ 25,000.00
Cecil Glen Arant $ 25,000.00
Otis Layne Arant $ 25,000.00
Janis Arant Battaglia $ 25,000.00
TOTAL $564,158.00

Dr. Cage and St. Francis filed JNOV and/or New Trial motions. As a result of these motions, the trial judge reduced the damages for past lost earnings of Mr. Arant from $153,600.00 to $112,793.70, but otherwise denied the motions.
Dr. Cage, LAMMICO, and St. Francis appealed. Plaintiffs answered the appeal, seeking restoration of the original jury verdict on loss of past earnings.

DR. CAGE
In a medical malpractice action against a physician who practices a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, the plaintiff has the two-fold burden of proving (1) the doctor's treatment fell below the standard of care expected of physicians in his medical specialty, and (2) a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
The law does not require absolute precision in medical diagnoses. A physician is not required to use the highest degree of skill and care possible, and he does not guarantee a particular result. Mike v. Maxwell, 577 So.2d 1090 (La.App. 1st Cir.1991); Matthews v. La. State Univ. Medical Center in Shreveport, 467 So.2d 1238 (La.App. 2d Cir.1985). The doctor's professional judgment and conduct are evaluated in terms of reasonableness under the circumstances at the time, not in terms of results or in the light of subsequent events. Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App. 2d Cir.1991).

*626 DIAGNOSIS
Our first concern is whether Dr. Cage's diagnosis of Arant's kidney condition as RCC and ordering its infarction fell below the standard of care required in his specialty as a urologist. Dr. Fulton, the only doctor to actually look at the arteriogram results prior to the infarction, described the arteriogram as showing the classic case of RCC.
Dr. Warren Koontz, plaintiffs' expert in urology and Dr. Cage's chief critic on postinfarction care, agreed with the diagnosis of RCC and stated that infarctions were the accepted practice in 1985, a statement confirmed by the other urologists. Every urological expert and every radiological expert who testified, whether called by the plaintiffs or the defendants, wholeheartedly agreed with Dr. Cage's diagnosis of RCC based on the medical evidence available to him at the time.[1] Further, Dr. Koontz even told the jury Dr. Cage gave Arant the very best advice he could have given him at the time in recommending the infarction procedure.
Although Dr. James Freeman, plaintiffs' expert in pathology,[2] could not find RCC in the right kidney from his review of Dr. Smith's autopsy slides,[3] there was no expert testimony at trial that Dr. Cages' diagnosis of RCC, or the infarction procedure recommended by him, fell below the standard of care applicable to urologists in 1985. Even if persuaded that Arant did not have RCC of the right kidney, the jury could not have reasonably concluded from the evidence that Dr. Cage fell below the standard of care in diagnosing Arant's right kidney problems as RCC, or in ordering the infarction.
Nonetheless, the jury obviously concluded that Dr. Cage misdiagnosed and treated RCC because it awarded $100,000 for pain and suffering before Arant's death, an award clearly inconsistent with any finding other than malpractice in diagnosing RCC and causing pre-death pain and suffering by ordering the infarction when it was not needed. However, because it is possible the jury may have also found Dr. Cage committed malpractice in his aftercare, our review does not end here.

POST-INFARCTION CARE
As previously stated, plaintiffs also claim Dr. Cage fell below the applicable standard of care in his treatment of Arant following the kidney infarction and before his death. In order to properly evaluate the care given or not given to Arant after the infarction, it is necessary to examine the possible causes of his death.
Dr. Freeman was also the plaintiffs' expert on the cause of Arant's death. Several years after Arant's death, Dr. Freeman examined the slides of lung tissue made by Dr. Smith at autopsy and concluded that death was due to constant showers of tiny fibrin emboli (blood clots) breaking loose from the infarction site, traveling through the blood stream, and collecting in the lungs, progressively interfering with the lungs' ability to put oxygen in the blood. According to Dr. Freeman, this ultimately caused death by asphyxiation, when the heart muscles and other organs in the body were deprived of sufficient oxygen to function.
Dr. Koontz questioned Dr. Freeman's pulmonary emboli theory and strongly felt Arant's death was related to severe infection. However, the jury could not have reasonably accepted Dr. Koontz's cause of death as complications from infection. All the pathologists at trial, namely Dr. Freeman, Dr. Smith, and Dr. Isabell Sesterhenn of the Armed Forces Institute of Pathology in Washington, D.C. (by video deposition), had viewed the autopsy slides taken by Dr. *627 Smith. Each unequivocably stated Arant was not suffering from infection at death and infection played no role in his death. Dr. Koontz is not a pathologist and never saw the slides of Arant's body. As acknowledged in plaintiffs' brief to this court, the jury probably accepted Dr. Freeman's pulmonary emboli theory as the cause of Arant's demise.[4]
Dr. Freeman told the jury that in order to diagnose a condition caused by tiny fibrin emboli showers to the lungs, the treating doctor has to suspect it. He called the condition an "inadvertent but nevertheless understandable complication of any kind of cell death anywhere" and refused to comment on the care given to Arant by the doctors or the hospital.
Although the jury could have drawn the reasonable conclusion that Arant died from pulmonary emboli as stated by Dr. Freeman, who would not comment on the care given Arant, we nonetheless inquire whether the testing suggested by Dr. Koontz for infection might have uncovered a developing oxygen exchange problem in Arant's lungs. The answer to the inquiry is somewhat speculative on our part because the jury was not given any expert opinion, even by Dr. Freeman, as to when such a developing condition might be first detectable.

DR. KOONTZ'S CRITICISMS
Dr. Koontz testified that fever of 105° was excessive for an infarction, and should have been a red flag to Dr. Cage that something was going on other than what one would expect from a routine infarction. He opined that a blood cell count should have been taken to show infection, that an IV should have been inserted to help fluid control, that antibiotics should have been administered to control infection, that blood cultures should have been performed to check for sepsis, that blood gases should have been taken to determine acidosis and oxygen in the blood, that fluid intake/output should have been monitored to check for kidney failure[5], and that electrolyte balance studies should have been performed.
Dr. Koontz admitted that some of his criticisms of Dr. Cage's care following infarction either bore no causal relationship to Arant's death, or were within the standard of care. For example, Dr. Cage explained that he discontinued the IV because Arant was "thrashing" around in bed, the IV would probably become displaced, and because the pain medication could also be administered intramuscularly (IM). Dr. Koontz admitted the decision to continue the IV was a judgment call for the doctor. Dr. Cobb, who dissented from the decision of the Medical Review Panel decision because he felt Dr. Cage should have maintained an IV in Arant, was not called as a witness. We must conclude there is no evidence to suggest that the mere failure to maintain an IV caused Arant's death.
The blood cultures which Dr. Koontz stated should have been performed would have taken 24 to 48 hours to complete. By the time Dr. Cage might have been alerted to order the tests, as suggested by Dr. Koontz, when Arant's temperature reached 105° on Thursday afternoon at about 2:00 p.m., the results of the tests would not have been available before Arant's death, which occurred 18 hours after his fever reached 105°. Mr. Arant clearly was not infected at death, according to the testimony of all of the pathologists. We cannot conclude that the blood cultures would have shown an infection. Further, the blood cell count and the antibiotics would also have been administered for possible infection, which was not present, according to the pathologists.
Dr. Koontz's criticism that fluid intake/output should have been monitored more closely might have been accepted by the jury, but was not shown to be a cause of Arant's death. Mrs. Arant said she was constantly giving her husband ice after the infarction, a fact known by Dr. Cage. Arant's urine output was shown to be regular *628 and normal after the infarction. Although the nurses' records show no urine was obtained when he was catherized at 11:30 p.m. on Thursday evening, a large output of 600 cc was taken only two hours earlier. Clearly, Arant's left kidney was functioning normally after his right kidney was infarcted. Dr. Freeman and Dr. Smith agreed that Arant's left kidney was normal at autopsy.
Testing Arant's arterial blood gases would have revealed, among other things, if Arant was acidotic and the percentage of oxygen in his arterial blood. While there is no evidence to suggest Arant was acidotic, or that it was a cause of death, the jury could have believed that the results of blood gases might have revealed the oxygen exchange problem. If the initial blood gas test showed a lower than normal percentage of oxygen in the arterial blood, repeated tests might have shown a decrease in blood oxygen, indicating the oxygen exchange problem was worsening. Other tests mentioned by Dr. Freeman might have pinpointed the problem to be showers of fibrin emboli from the infarction site.
Even had Dr. Cage ordered the test for blood gases, there is no evidence in the record to establish that these tests should have been ordered any earlier than when Arant's temperature rose to over 105° early in the afternoon of Thursday, March 21. No witness testified to any symptom of a possible emboli problem until this time.[6] If Dr. Cage had discovered the oxygen exchange problem by mid-afternoon on Thursday, the questions then become what could he have done about it, and what were Arant's chances of survival.
According to Dr. Freeman, Arant's ever worsening oxygen exchange problem from fibrin emboli in his lungs would have caused his death in a few hours. Yet, Arant also had a liver cancer and a severely enlarged right kidney, that at worst, was riddled with RCC, and at best, was dead or dying from the infarction. The medical evidence shows Dr. Cage had already chosen to wait the longest time medically prudent after the infarction to perform surgery in order to achieve the best possible immune response. Arant was facing major surgery on Friday and heavy blood loss from the kidney and the liver was already expected.
The only evidence as to what could have been done for the emboli problem if it had been discovered, came from Dr. Freeman, who suggested that intravenous heparin, a blood thinner and anti-coagulant, was appropriate. According to Dr. Freeman, "hopefully this treatment prevents additional clotting." When asked on cross-examination if heparin should be given before a major operation in which heavy blood loss is already anticipated, Dr. Freeman responded: "If he dies faster without the heparin, yes, I'd give the heparin. If he'll die faster with the heparin, no, I wouldn't give the heparin." Dr. Cage testified that giving heparin before major surgery would be "insanity."
The plaintiffs presented no evidence as to the effectiveness of heparin, over what period of time it should be given, and what Arant's chance of survival was with or without heparin treatment. No expert in the field of heparin treatment was called. Dr. Koontz, plaintiffs' urology expert, was never asked what the standard of care is for a urologist who is aware of an oxygen exchange problem that might be treatable by heparin, yet who is also aware that major surgery with heavy blood loss is required within a few hours.

THE LAW
In Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 720, 722 (La.1986), the court stated it is "not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival" and that it is only "necessary to show a reasonable probability that the procedure would have been life saving in these circumstances."
*629 In Smith v. State of Louisiana Through the Department of Health and Human Resources Administration and Dr. Edward Staudinger, 523 So.2d 815, 821 (La. 1988), the court discussed the evidence that was required for the plaintiffs to meet their burden of proof:
There is simply no evidence in the record as to whether treatment undertaken earlier would have provided the decedent a chance of survival that she otherwise would not have had. Plaintiff's expert said that it was "possible" that measures could have been undertaken which would have increased the patient's chances of survival, but he did not specify what those measures were and he did not assess in any detail what the quantitative chances of survival would have been. Dr. Staudinger indicated that he would have adopted a different treatment plan if he had received at an earlier time the same EKG result he obtained at 11:45 P.M. However, there is no evidence which shows that these measures would have increased the chances that the patient would have avoided or survived a cardiac arrest.
Specifically, Dr. Staudinger testified that if he had discovered the atrial fibrillation at an earlier point in time, he would have (1) placed the patient on a heart monitor (2) obtained a medical consultation (3) possibly placed the patient on an unspecified type of medication and (4) moved the patient to intensive care. However, there was no testimony to the effect that any of these measures would have increased the patient's chances of survival (and if so, how, and by how much). The only witness queried to that end was Dr. Staudinger, who stated that the patient could have had a heart attack regardless of whether she was in the emergency room or the intensive care unit.
Plaintiffs seem to argue that we should assume that the defendants' failure to employ preventive treatment measures decreased the patient's chances of survival. It is true that one can logically assume that certain alternative methods of treatment, such as moving the patient to intensive care and placing her on a heart monitor, would have constituted an effort to decrease the risk that she would go into cardiac arrest. But would the risk of cardiac arrest actually have been decreased? This is a question which the record before us does not answer, and absent at least some evidence on the issue, we cannot simply assume that the defendant's failure to employ a more active course of treatment denied this heart patient a chance of survival.
A different result is appropriate in those cases where the plaintiff does in fact demonstrate, through expert testimony or otherwise, that the defendant's malpractice resulted in the loss of the patient's chances for survival. Hamil v. Bashline, 481 Pa. 256, 392 A.2d 1280 (1978) is an example of a case which involves somewhat similar facts and in which the plaintiff did present sufficient evidence on causation. Emergency room physicians failed to promptly treat a patient who was admitted complaining of severe chest pains, and later died of a heart attack. The plaintiff's expert witness testified that if the defendants had timely administered an EKG and employed other specific treatment measures, including bed rest, oxygen and pain relieving drugs, the decedent would have had a 75% chance of surviving the heart attack. A number of other common law jurisdictions have found that the plaintiff may establish causation by proving that the defendant's negligence destroyed the patient's chances of avoiding injury or death, even in instances where the patient's chances of survival were less than fifty percent under any circumstances. See Herskovits v. Group Health Cooperative of Puget Sound, 99 Wash.2d 609, 664 P.2d 474, 479-87 (1983) (extensive discussion of "loss of chance" doctrine by Pearson, J., concurring).
Even prior to Hastings, at least two Louisiana appellate court decisions upheld the right of medical malpractice plaintiffs to recover in instances where it was proven that the defendant's negligence destroyed a significant chance that *630 the patient's death or injury could have been avoided. See, e.g., Hunter v. Office of Health Services, 385 So.2d 928, 932-33 (La.App. 2nd Cir.), writ denied 393 So.2d 737 (La.1980) (evidence established that defendant's failure to timely diagnose malignant melanoma caused cancer victim "to fall from the category of persons who would statistically have been expected to survive to the category in which there was almost no chance of survival."); Fairchild v. Brian, 354 So.2d 675, 679-80 (La.App. 1st Cir.1977) (delay in discovering detached retina until it was too late to save plaintiff's eyesight was directly attributable to defendant's negligence).
The common denominator among these loss of chance cases in which the plaintiff has prevailedHamil, Hunter, Fairchild, and the numerous cases cited in Justice Pearson's scholarly concurring opinion in Herskovitsis that in each case there was sufficient evidence to support the proposition that the patient's chances of avoiding injury or death had been decreased due to the defendant's negligence.
Similarly, we found in Hastings that there was sufficient evidence for the jury to find that the defendants' failure to promptly perform a surgical procedure on a stabbing victim who was allowed to bleed to death without surgical intervention, destroyed the victim's chances of survival, and for that reason we reversed the trial court's directed verdict in favor of the defendant.
The medical malpractice plaintiff does not have the unreasonable burden of proving that the patient would have lived if the defendant had not been negligent. However, the plaintiff does have the burden of establishing by a preponderance of the evidence that the defendant's conduct denied the patient a chance of survival. Even if the destruction of less than a fifty percent chance of survival is compensable, the plaintiff must in the first instance prove by a preponderance of the evidence that such a chance existed and that it was lost as the result of the defendant's negligence.
In this case, the plaintiffs did not present evidence to show what chance of survival Mr. Arant had under the circumstances existing on Thursday afternoon. Dr. Freeman's testimony, only briefly discussing heparin treatment and "hoping" it would prevent further clotting, gave no clue as to Arant's chance of survival. Dr. Freeman's answer as to what he would have done suggested death for Arant if heparin was used and death for Arant if it was not used. There is no evidence in the record as to the success rate of heparin, how long it can be given, and under what circumstances it can be used. The jury was given no quantitative assessment, even by Dr. Freeman, or any expert in heparin treatment, as to Arant's chance of survival if heparin had been used as soon as the condition was discovered.
The jury was presented no testimony that a urologist is below the standard of care if he fails to use heparin as a preventative measure following an infarction, nor evidence of the chance of success if heparin was routinely used. As indicated in Smith, the jury could logically assume that heparin treatment would have constituted an effort to decrease the risk presented by the emboli, but without some evidence on the issue, the jury could not simply assume that the failure to give heparin denied Arant a chance of survival. For all that is known from the record, Arant may have had no chance of survival as of Thursday afternoon. If surgery was delayed because heparin was given, Arant could have become severely and fatally septic from his rotting kidney. If surgery was performed after heparin was given, Arant may have bled to death.
Without a doubt, on Thursday afternoon, the earliest time suggested that Dr. Cage could possibly have been alerted to and discovered the emboli problems, Arant was in a tragic predicament. It is the plaintiffs' obligation to show Arant had a chance of survival, to quantify that chance, and to show Dr. Cage's negligence deprived him of that quantified chance. The plaintiffs clearly failed to show any chance of Arant's survival. If construed as awarding *631 damages for destruction of a chance of survival, whether for either or both negligent aftercare and malpractice in the diagnosis and treatment of RCC, the jury's verdict is clearly erroneous, and without factual basis in this record.

ST. FRANCIS MEDICAL CENTER
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause-in-fact of the injury. Smith, supra.
Although circumstantial evidence may be used to establish negligence, the inferences drawn from the circumstantial evidence must cover all the necessary elements of negligence and the plaintiff must still sustain the burden of proving that his injuries were more likely than not the result of the defendant's negligence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989). The circumstantial evidence must establish causation with a fair degree of certainty, and must exclude every other reasonable hypothesis except the one relied upon. Butler v. Baber, 529 So.2d 374 (La.1988); Townsend v. State, Department of Highways, 322 So.2d 139 (La.1975); Youngblood v. Sanders, 513 So.2d 521 (La.App. 2d Cir.1987).
The plaintiff need not prove that the patient would have survived if proper treatment had been given, but rather need only show that there would have been a chance of survival and that the hospital's conduct increased the risk of harm by being a substantial factor in causing the harmful result. Hastings, supra.

NURSING CARE
Plaintiffs called Nurse Theresa Kevil, to testify about the quality of health care provided by St. Francis' nurses. Kevil stated some of the most important functions of a nurse are to keep good records of the patients, and to inform the doctors and other nursing shifts of changes in the patient's condition. Based on the infarction procedure Arant had undergone and the fact that he was a renal patient, Kevil told the jury Arant required a high degree of monitoring and opined that the monitoring by the St. Francis nursing staff was not adequate. Her criticisms included inadequate monitoring of vital signs, temperature, and kidney output. Kevil explained that if the patient is not adequately monitored, it is more difficult to treat the patient because the patient's condition cannot be properly assessed by the doctor.
Following the infarction, Dr. Fulton ordered that Arant's vital signs be checked every hour for the six hours after the recovery period, and then once every four hours for the next twenty-four hours. The hospital showed that Arant was checked at 4 p.m. on Wednesday, but was not checked again until 8 a.m. on Thursday.
Kevil also stated that according to the clinical record chart, the nurses discovered he had a 105° temperature at 12:00 p.m. on Thursday, implying a two hour delay in contacting Dr. Cage. However, Nurse Kathleen Harper testified that from her personal recollection Arant's temperature was actually taken shortly before 2:00 p.m. as shown in the nurse's patient record, and that Dr. Cage was immediately notified. Harper explained that the chart is separated into four hour increments and that an entry for a 2:00 p.m. temperature would either have to go in the 12 o'clock noon space, as it was here, or in the 4:00 p.m. space. Harper stated it was impossible to tell from the chart exactly when the temperature was taken.
Apart from Kevil's opinion that good nursing requires a written record of fluid intake and output and that inadequate monitoring and recordkeeping may affect a patient's treatment, plaintiffs failed to produce any expert testimony that deficient monitoring or recordkeeping caused or contributed to Arant's death. Plaintiffs also failed to show the significance, if any, of Arant's skin color and condition noticed by Mrs. Arant and Mr. Teel on the morning of *632 his death. They failed to show the significance, if any, of his slightly elevated respiration recorded shortly before his death. Further, like their case against Dr. Cage, plaintiffs failed to prove Mr. Arant had a chance of survival on Thursday afternoon, and they failed to prove that inadequate nursing care in any way deprived him of that chance.

DEFIBRILLATOR
The plaintiffs also argue that a defibrillator, used to deliver two electric shocks to Arant's heart muscles on the morning of March 22, failed to recharge after the second shock, thus depriving Arant of a possible third shock that might have revived him.
When Dr. Ulrich heard the cries for help and ran into the room, he thought Arant was already dead, but nonetheless began mouth-to-mouth resuscitation. Nurse Evelyn Horne arrived and instituted the Code 99 at 7:42 a.m. Dr. Gates and emergency teams arrived soon thereafter. They administered a number of drugs to stimulate the heart, but could not get life responses.
The defibrillator was then charged, and at 7:50 a.m. the first shock was given to the heart. An EKG tape showed no life signs. A second shock was given at 8:00 a.m., but again was unsuccessful. On both occasions Arant's body "jumped" as expected, indicating the defibrillator was working properly. Further, Dr. Smith, in her autopsy, found the expected defibrillator burn marks on Arant's chest.
Dr. Ulrich, who actually used the defibrillator, said he fired it twice and that it worked both times. Nurse Jo Ann Jernigan, Nurse Theresa Marsala, and Dr. Fulton testified they saw Arant shocked twice. All testified there was never a third attempt to use the machine. Even if another attempt was thought necessary, the evidence is clear a second defibrillator was available immediately outside Arant's room.
The only evidence even slightly favorable to the plaintiffs on this issue was the testimony of Nurse Christian who said that she heard someone say at the Code 99 regarding the defibrillator "it's not working, we need another one," and another defibrillator was brought in.
The evidence is overwhelming that the defibrillator played no role in Arant's death. No rational jury could have found otherwise on the evidence presented.

CONCLUSION
The jury obviously found Dr. Cage liable for malpractice in his diagnosis of RCC and recommendation to infarct Arant's right kidney, because it awarded $100,000 for Arant's pre-death pain and suffering. This jury determination is clearly erroneous because plaintiffs failed to produce any evidence that Dr. Cage's diagnosis of RCC and the infarction procedure fell below the applicable standard of care, even if we assume the diagnosis was incorrect.
If the jurors also believed Dr. Cage was guilty of malpractice in his aftercare leading to Arant's death, they were clearly wrong because plaintiffs failed to sustain their burden of proving Arant had a chance of survival which was taken away by Dr. Cage's malpractice.
The jury's determination that St. Francis Hospital was liable in part for Arant's death is also clearly erroneous for the same reasons. Further, plaintiffs failed to present expert testimony to establish a causal relationship between any deficiencies the jury might have accepted in the monitoring and reporting of Arant's condition by St. Francis nurses and Arant's demise. Lastly, the evidence is overwhelming that the failure of the defibrillator to recharge after the second shock played no role in Arant's death.

DECREE
For the reasons given, the judgment of the trial court is reversed, and judgment is rendered dismissing plaintiffs' claims against Dr. Cage, LAMMICO, and St. Francis *633 Medical Center.[7] All costs are assessed to appellees.
REVERSED AND RENDERED.
NOTES
[1] The CAT-scan and the arteriogram are in this record. Both show obvious deformities in the right kidney and a spot on the liver.
[2] Dr. Freeman was qualified in pathology and clinical medicine, but expressed a reluctance to give clinical impressions. He stated his opinion was based on the autopsy slides, the autopsy report, the report from the Air Force Institute of Pathology, and nothing else.
[3] Dr. Smith also found no RCC on the slides. She testified the slides were taken only from the remaining recognizable rim of the kidney, not from the infarcted mass of the kidney, which supposedly contained the cancerous tumor.
[4] The defendants presented testimony of other unavoidable causes of death such as heart trouble, shock, pain, fear, fever, or a combination of these problems.
[5] None of the pathologists found any abnormality of Arant's left kidney from their examinations of the autopsy slides.
[6] Dr. Freeman testified the symptoms for the problem are shortness of breath (inability to breath), rapid breathing (hypocapnia), rapid pulse, and high fevers.
[7] Considering our decision in this case, all other issues raised on appeal need not be addressed.