988 So.2d 279 (2008)
Christine BENEFIELD, et al., Plaintiffs-Appellees
v.
Jennifer SIBLEY, RN, et al., Defendants-Appellants.
No. 43,317-CA.
Court of Appeal of Louisiana, Second Circuit.
July 9, 2008.
Rehearing Denied August 7, 2008.
*283 Mayer, Smith & Roberts, L.L.P. by Stephen E. Soileau, Shreveport, for Defendants-Appellants Jennifer Sibley, RN, and Lifeline Nursing Co.
Watson, Blanche, Wilson & Posner by Chris J. LeBlanc, Baton Rouge, for Defendant-Appellant Willis-Knighton Medical Center.
Pugh, Pugh & Pugh by Robert G. Pugh, Jr., Shreveport, for Defendant-Appellee Kevin J. Cline, M.D.
Rodel, Parsons, Koch, Blache, Bahloff & McCollister, A L.C. by David A. Woolridge, Jr., Carlton Jones, III, Baton Rouge, for Intervenor-Appellee Louisiana Patient's Compensation Fund Oversight Board.
*284 Herman, Herman, Katz & Cotlar by James C. Klick, Joseph A. Kott, New Orleans, for Plaintiffs Appellees.
Before STEWART, GASKINS and PEATROSS, JJ.
GASKINS, J.
The defendants, Jennifer Sibley, R.N., Lifeline Nursing Company, and Willis-Knighton Medical Center, appeal from a jury verdict and trial court judgment finding that Ms. Sibley breached the applicable standard of care to the decedent, Herman Ray Benefield, resulting in a lost chance of survival and awarding his survivors $260,000 in damages. For the following reasons, we affirm the jury verdict and trial court judgment.

FACTS
Herman Ray Benefield was admitted to Willis-Knighton Medical Center on September 25, 2002. His urologist, Dr. Kevin Cline, performed a transurethral resection of the prostate (TURP) on that day. Mr. Benefield developed internal bleeding. On the morning of September 26, 2002, Dr. Cline's partner, Dr. Tommy Mook, saw Mr. Benefield and ordered a blood transfusion. Mr. Benefield's nurse during the day was Junice Wagoner. Around 3:00 p.m., when shifts changed, Ms. Wagoner was replaced by Jennifer Sibley. Ms. Sibley claimed that Ms. Wagoner told her that Mr. Benefield was having some difficulty breathing and that she had tried to contact Dr. Cline. When Ms. Sibley checked on Mr. Benefield at approximately 3:30 p.m., his respirations were 50 breaths per minute. This was cause for some concern. There is a dispute in the record concerning Ms. Sibley's alleged attempts to contact Dr. Cline. At 4:20 p.m., Mr. Benefield's condition worsened and an emergency code was called. Dr. Cline arrived at the hospital, but Mr. Benefield did not survive and was pronounced dead at 5:24 p.m. An autopsy revealed that the cause of death was a massive pulmonary embolus, also known as a blood clot, that lodged in an artery leading to the lung.
Mr. Benefield's widow, Christine Benefield, and his two adult children, Herman Ray Benefield, II and Christopher Shawn Benefield, sought to recover for wrongful death and survival damages and for loss of a chance of survival. The plaintiffs claimed that Mr. Benefield's death was the result of a breach of the standard of care by Ms. Sibley, Lifeline Nursing Company (Lifeline), Willis-Knighton Medical Center (WKMC), Ms. Wagoner, and Dr. Cline.[1] Basically, the plaintiffs claimed that Ms. Sibley failed to contact Dr. Cline in a timely fashion, preventing the opportunity for intervention and medical care that could have saved Mr. Benefield's life and resulting in the loss of a chance of survival.
The plaintiffs originally filed suit in September 2003, in order to interrupt prescription. There was some question as to whether Ms. Sibley and Lifeline were qualified health care providers under the Louisiana Medical Malpractice Act (LMMA), requiring that the claims against them first be submitted to a medical review panel. Ms. Sibley was employed by Lifeline, which was not a qualified health care provider. That company contracted with WKMC to provide nurses. The parties eventually stipulated that WKMC would be vicariously liable for any fault attributable to Ms. Sibley because she was a contract nurse under the control of WKMC. WKMC was a qualified health care provider. Therefore, Ms. Sibley was considered to be a qualified health care provider because of her employment with WKMC *285 and the entire matter was submitted to the medical review panel.
On May 9, 2005, the medical review panel issued an opinion finding that the evidence did not support the conclusion that the defendants failed to meet the applicable standard of care. The panel found that the decedent died of a condition that was not preventable and that death is inevitable in most cases despite prompt medical care. The panel found that there was no loss of a chance of survival. According to the panel, Ms. Sibley was watching the patient closely and there was no problem until a massive embolus occurred and then it was too late.
The plaintiffs went forward with their lawsuit, asserting wrongful death and survival actions and loss of a chance of survival. Eventually, the plaintiffs dropped their wrongful death and survival claims and sought to show only that the actions of the defendants resulted in a loss of a chance of survival. The Louisiana Patient's Compensation Fund (PCF) was allowed to intervene.
The matter was tried before a jury on March 5-9, 2007. The jury found that the plaintiffs proved by a preponderance of the evidence that Ms. Sibley, as an employee of Lifeline, breached the standard of medical care in her treatment of the decedent and that the breach caused the decedent to sustain a loss of a chance of survival. The jury found that neither WKMC nor Dr. Cline breached their standards of care in their treatment of the decedent. The jury, in a 9-3 verdict, found that Ms. Sibley was 100 percent at fault in causing the loss of a chance of survival and assessed damages at $260,000.
On June 12, 2007, Ms. Sibley, Lifeline, and WKMC filed a motion for judgment notwithstanding the verdict. They argued that the court should render a judgment finding that there was no loss of a chance of survival caused by the alleged breach of the standard of care by Ms. Sibley and that, in the alternative, the court should reduce the amount of damages awarded. The trial court denied the motion in August 2007.
Ms. Sibley, Lifeline, and WKMC appealed the judgment. On appeal, the defendants claim that the trial court erred in finding that there was a breach of the standard of care by Ms. Sibley, that her action or inaction was a cause of harm, and that there was a loss of a chance of survival. The defendants assert that the trial court should have required that the jury make a determination of the percentage of the chance of survival. The defendants maintain that the damage award was excessive. Lifeline also argues that the trial court erred in failing to limit the liability of Lifeline to $100,000, as specified in the Louisiana Medical Malpractice Act.

BREACH OF THE STANDARD OF CARE
The defendants argue that the jury erred in finding that there was a breach in the applicable standard of care by Ms. Sibley. The plaintiffs contend that Ms. Sibley breached her standard of care by failing to notify Dr. Cline in a timely fashion when she observed that Mr. Benefield was having difficulty breathing. According to the defendants, Ms. Wagoner attempted to contact Dr. Cline prior to 3:00 p.m., and Ms. Sibley tried to reach him several times. They maintain that the hospital records support their claim. The defendants recognize that there is a dispute regarding when Dr. Cline was notified, but they assert that the only credible evidence shows that Ms. Sibley tried to contact Dr. Cline in a timely manner and therefore did not breach her standard of care to Mr. Benefield. This argument is without merit.

*286 Legal Principles
The manifest error standard applies to the review of medical malpractice cases. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Wiley v. Lipka, 42,794 (La.App. 2d Cir.2/6/08), 975 So.2d 726, writ denied, XXXX-XXXX (La.5/2/08), 979 So.2d 1284; Little v. Pou, 42,872 (La.App. 2d Cir.1/30/08), 975 So.2d 666; Harper v. Smith, 42,586 (La.App. 2d Cir.10/24/07), 968 So.2d 321, writ denied, XXXX-XXXX (La.2/22/08), 976 So.2d 1287; Wilhite v. Thompson, 42,395 (La.App. 2d Cir.8/15/07), 962 So.2d 493, writ denied, 2007-2025 (La.2/15/08), 976 So.2d 175. In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Harper v. Smith, supra; Wilhite v. Thompson, supra. The issue to be decided by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Wiley v. Lipka, supra.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Where the factfinder's conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Wiley v. Lipka, supra; Harper v. Smith, supra.
It is well settled that a hospital is liable for its employee's negligence, including its doctors and nurses, under the respondeat superior doctrine. In a medical malpractice claim against a hospital, the plaintiff is required to prove by a preponderance of the evidence, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved (or the applicable standard of care), and the injury was caused by the breach. Little v. Pou, supra.
Nurses who perform medical services are subject to the same standards of care and liability as are physicians. The nurse's duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Little v. Pou, supra.
Injury alone does not raise a presumption of negligence. Hindsight or subsequent events cannot be considered when determining whether the actions of the nursing staff were reasonable and met the standard of care. Instead, the professional judgment and conduct of the nurses is evaluated under the then existing circumstances, not in terms of result or in light of subsequent events. Little v. Pou, supra.

Discussion
In the present case, the plaintiffs contend that Ms. Sibley violated her standard of care as a nurse in failing to notify Dr. Cline in a timely manner that Mr. Benefield was having trouble breathing. The evidence presented at trial showed a conflict *287 regarding Ms. Sibley's attempts to contact Dr. Cline.
Ms. Sibley testified that she came on duty around 3:00 p.m. and that Ms. Wagoner, the nurse on the earlier shift, apprised her of the condition of the patients. She alleged that Ms. Wagoner told her that Mr. Benefield was having trouble breathing and that a call had been placed to Dr. Cline. Ms. Wagoner's nursing notes do not contain such a notation. Ms. Sibley said that at 3:32 p.m., she observed that Mr. Benefield's respiration rate was 50 breaths per minute, which was unusually high. She did not call Dr. Cline at that time because she thought Ms. Wagoner had already placed a call. At 3:55 p.m., Ms. Sibley noted that Mr. Benefield's respiration rate was still 50 breaths per minute. She stated that she asked a secretary to call Dr. Cline, but she did not document the call in her nursing notes. She said that she did not think that Mr. Benefield's condition was a crisis and she did not contact her nursing supervisor at WKMC. Ms. Sibley claimed that she put oxygen on Mr. Benefield and used a pulse oximeter to check his blood oxygen saturation level; she found that it was normal. However, she did not document her actions in her nursing notes.
Ms. Sibley claimed that at 4:00 p.m., she called Dr. Cline's office and talked with his nurse, Sherry Ebling, who said that she would give Dr. Cline the message and Dr. Cline would call back.
At 4:20 p.m., Mrs. Benefield called from the room for help. Other nurses went to the room and Ms. Sibley said that she called Dr. Cline's office from the nurse's station. While she was talking with Dr. Cline, one of the nurses in Mr. Benefield's room called an emergency code.
At trial, Ms. Sibley was questioned as to the reason that her nursing notes were not entered during her shift. The notes show that they were entered the next day, more than 12 hours after Mr. Benefield's death. Ms. Sibley said that, as she cared for patients, she made handwritten notes which she entered into the hospital computer later.
Sherry Ebling, Dr. Cline's nurse, testified that at the time of this incident, part of her duties entailed receiving phone calls from hospitals about patients and informing the doctor. Ms. Ebling said that she received only one call about Mr. Benefield late in the afternoon, after 4:00 p.m. The hospital caller reported that Mr. Benefield was experiencing trouble breathing postoperatively. She stated that Dr. Cline took the call and then left for the hospital. The next day, Dr. Cline told her that Mr. Benefield passed away. Ms. Ebling said that she had no reason to believe that more than one call was made to Dr. Cline. Ms. Ebling denied that she received a phone call from the hospital and told the caller that Dr. Cline would call back, as testified by Ms. Sibley.
Brenda Medley, a nurse practitioner, testified as an expert on the standard of care for nurses. Ms. Medley reviewed this matter and found several violations of the standard of care by Ms. Sibley. After observing that Ms. Sibley's nursing notes were made the following day, Ms. Medley found that Ms. Sibley breached the standard of care by failing to document her nursing care in a timely manner. She stated that nursing notes should be completed as close in time as possible to when the events occurred. In this case, the notes were written more than 12 hours after the patient's death. Ms. Medley stated that when emergencies occur, other nurses fill in so that nursing notes can be completed in a timely manner.
Ms. Medley found that Ms. Sibley failed to provide accurate and timely documentation. *288 She stated that Ms. Sibley's recordation of Mr. Benefield's vital signs was questionable. She said that when respirations increase, the heart rate should have increased also. However, according to Ms. Sibley's notes, Mr. Benefield's heart rate decreased.
Ms. Medley testified that Ms. Sibley breached the standard of care in failing to communicate with Dr. Cline. According to Ms. Medley, Ms. Sibley should have called Dr. Cline when she first observed that Mr. Benefield's respiration rate was 50 breaths per minute and then she should have alerted the charge nurse. Ms. Medley said that Ms. Sibley breached the standard of care by failing to act as a patient advocate. She observed Mr. Benefield's difficulty, but did nothing to help.
Ms. Medley testified that she did not observe any breach by any other person other than Ms. Sibley. Ms. Medley observed that all notes by other nurses were completed in a timely manner. Further, when Mr. Benefield had trouble with a catheter and with bleeding after surgery, Dr. Cline or his partner was timely contacted and responded promptly. When questioned about Ms. Sibley's assertion that Ms. Wagoner observed and told her about Mr. Benefield's increased respiration rate and said she had called Dr. Cline's office, Ms. Medley noted that none of that appeared in Ms. Wagoner's nursing notes. Ms. Wagoner's notes indicate that Mr. Benefield tolerated his blood transfusion well.
Dr. Raoul Bezou, an expert in urology, testified by deposition that he reviewed the hospital records in this matter and concluded that Dr. Cline was not timely informed of Mr. Benefield's condition. Dr. Bezou observed that Ms. Sibley's nursing notes were not entered in a timely fashion and the notes from all other physicians and nurses were. He stated that Dr. Cline should have been notified immediately when Ms. Sibley first observed the patient's breathing difficulty. According to Dr. Bezou, if Ms. Sibley failed to timely notify Dr. Cline, she breached the standard of care for nurses.
Dr. Cline testified that on the afternoon of this incident, he received one call from the hospital regarding Mr. Benefield. He said that the call was received between 4:15 and 4:30 p.m. Dr. Cline left for the hospital immediately. While en route, he called the hospital and learned that an emergency code had been called. He stated that he should have been called when Ms. Sibley first observed Mr. Benefield's respiration rate to be 50 breaths per minute.
Dr. Michael Cage, an expert in urology and a member of the medical review panel, testified that if Ms. Sibley did not make the phone calls to Dr. Cline that she claimed she did, then she breached the applicable standard of care.
Dr. Matthew Schuette, an expert in pulmonary medicine, testified that Ms. Sibley breached her standard of care by failing to measure Mr. Benefield's oxygen saturation level in his blood. He stated that Ms. Sibley should have called Dr. Cline at 3:32 p.m. when she first observed that the patient's respiration rate was elevated.
Mrs. Benefield testified that she arrived at the hospital around 3:00 p.m. and noted that her husband was having trouble breathing. Mrs. Benefield said she went to the nurse's station to express her alarm and was told that Dr. Cline knew about the situation. She said that a nurse came in and took her husband's vital signs and said that they were normal. Mrs. Benefield testified that she never observed anyone take a pulse oximeter reading to test her husband's oxygen level. Later, when she noted that her husband was experiencing *289 increased difficulty in breathing, Mrs. Benefield said that she called the nurse's station and spoke to Ms. Sibley; she said that Ms. Sibley failed to respond to her call for help. Finally, when her husband slumped over, she went into the hall and screamed for help. At that point, several nurses rushed into the room.
The plaintiffs established that the applicable standard of care for nurses in this matter required that Ms. Sibley contact Dr. Cline at 3:32 p.m. when she first noticed that Mr. Benefield's respiration rate was markedly elevated. While Ms. Sibley claims that several attempts were made to contact Dr. Cline, some of these alleged attempts were not documented in the record and others were disputed by other witnesses.
Based upon this record, there was more than an adequate basis for the jury to conclude that Ms. Sibley breached the standard of care for nurses in this case. The jury obviously discounted Ms. Sibley's testimony and concluded that she breached her standard of care in failing to timely contact Dr. Cline and in failing to contemporaneously document the actions she took in attending to Mr. Benefield. There is no evidence or testimony to corroborate Ms. Sibley's claim that she obtained a pulse oximeter reading to measure the oxygen level in Mr. Benefield's blood. The jury was not manifestly erroneous or clearly wrong in finding that Ms. Sibley breached the standard of care in this case. Therefore, we affirm the jury finding in this regard.

CAUSE OF HARM AND LOSS OF A CHANCE OF SURVIVAL
The defendants urge that no action or inaction by Ms. Sibley was the cause of the damages claimed by the plaintiffs. They argue that the evidence and testimony at trial show that there was nothing that could have been done to treat the pulmonary embolus and save Mr. Benefield's life.
In a similar argument, the defendants also contend that the plaintiffs failed to prove that there was a quantifiable loss of a chance of survival and that the trial court erred in failing to require the jury to make such a determination. These arguments are without merit.

Legal Principles
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. A substantial factor need not be the only causative factor; it need only increase the risk of harm. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
The plaintiff does not have to shoulder the unreasonable burden of proving that the patient would have lived had proper treatment been given. Smith v. State through Department of Health and Human Resources Administration, 523 So.2d 815 (La.1988). However, the plaintiff does have the burden of establishing by a preponderance of the evidence that the defendant's conduct denied the patient a chance of survival. Even if the destruction of less than a 50 percent chance of survival is compensable, the plaintiff must in the first instance prove by a preponderance of the evidence that such a chance existed and that it was lost as the result of the defendant's negligence. Smith v. State through Department of Health and Human Resources Administration, supra. Destruction of a 2 percent chance of survival has been held to present a jury question as to causation. Hastings v. Baton Rouge General Hospital, supra.

*290 Discussion
Dr. Cameron Snider performed the autopsy on Mr. Benefield. He determined that the cause of death was a right mainstream pulmonary embolus, i.e., a blood clot occluding the blood flow to the right lung. He found numerous micro emboli in the lungs and believed that these formed first, in the area of the prostate surgery, and traveled to the lungs, followed by the large embolus which caused death. He felt the micro emboli initially caused the shortness of breath and that the large embolus occurred at around 4:40 p.m., shortly before Mr. Benefield's death. Dr. Snider felt that any chance to intervene was lost by the failure to timely contact Dr. Cline.
Dr. Matthew Schuette, an expert in pulmonology, testified that Ms. Sibley's failure to promptly notify Dr. Cline resulted in a loss of a chance of survival for Mr. Benefield. Dr. Schuette stated that around 3:30 p.m., when the patient's breathing became rapid, there was an opportunity to act. He said that a respiratory rate of 50 breaths per minute was an emergency. Dr. Schuette noted that no pulse oximeter test was performed. This test would have helped determine what was causing the difficulty.
Dr. Schuette disagreed with the medical review panel opinion stating that nothing could have been done to save Mr. Benefield's life. According to Dr. Schuette, the mortality rate for a massive pulmonary embolus is between 30 and 50 percent; a significant percentage of people survive pulmonary emboli. He noted that more than 50 minutes passed between the observation of the onset of Mr. Benefield's rapid breathing and any intervention. Dr. Schuette said that breathing at that rate would fatigue the patient. While Dr. Schuette acknowledged that a pulmonary embolus would have taken time to diagnose, he felt that support could have been provided to intubate and stabilize the patient until the diagnosis was made. He stated that the chance to alter the outcome in this case was small, but he said it was not insignificant. Dr. Schuette was questioned about the administration of the drug heparin if a pulmonary embolus had been diagnosed prior to the patient's death. He indicated that heparin would not have been a good treatment for Mr. Benefield because of his problems with bleeding from his surgery. When asked to quantify Mr. Benefield's loss of a chance of survival, Dr. Schuette opined that Mr. Benefield lost a 20 percent chance of survival.
Dr. Bezou testified that he disagreed with the medical review panel opinion which concluded that there was no loss of a chance of survival in this case. He stated that Dr. Cline should have been immediately notified, and the patient's blood oxygen level should have been measured. A pulmonologist could have been called to intubate the patient, and he could have been sent to ICU.
Dr. Michael Cage, an expert in urology and a member of the medical review panel, stated that there was no loss of a chance of survival in this case. He stated that a pulmonary embolus is a medical disaster and that drugs to thin the blood or dissolve the clot could not have been administered to a patient with bleeding. Later, Dr. Cage said that if phone calls to Dr. Cline were not timely made, there was some loss of a chance of survival, but it would have been very minimal.
Dr. Arthur Liles, an expert in urology and also a member of the medical review panel, testified that he did not think that there was a loss of a chance of survival in this case. He stated that the pulmonary embolus was a lethal event and nothing could have been done to save Mr. Benefield. *291 Dr. Liles said that the medical review panel assumed that the nursing notes were correct and that if Ms. Sibley did not try to contact Dr. Cline, as she said, it would alter his opinion somewhat.
Dr. Cline outlined Mr. Benefield's medical history, his need for surgery, and the care he received after the procedure. Dr. Cline said that he hated the outcome, but did not think that anything could have been done to save Mr. Benefield.
Dr. James Smith, an expert in pulmonary care, testified that 20 to 30 percent of people survive pulmonary emboli, but he did not think that the embolus in this case could be diagnosed and resolved before death. He commented on previous testimony that Mr. Benefield should have been intubated and stabilized. He thought that the intubation process would initially destabilize the patient. According to Dr. Smith, "I believe that his chance for survival if not zero is extraordinarily minimal, unfortunately." Dr. Smith opined that Mr. Benefield would not have survived even if Dr. Cline had been by his bedside when the breathing difficulty began.
In this matter, there were two permissible views of the evidence and the jury's conclusion is based on a determination regarding the credibility of the witnesses. The jury heard conflicting opinions regarding whether Mr. Benefield suffered the loss of a chance of survival due to Ms. Sibley's delay in contacting Dr. Cline. The jury obviously made a choice between the conflicting opinions and concluded that Mr. Benefield did suffer the loss of a chance of survival.
The defendants argue that the trial court erred in failing to require the jury to make a determination of the percentage of the loss of a chance of survival suffered by Mr. Benefield. They urge that in a loss of a chance of survival case, a plaintiff must show that there is a "quantifiable" loss of a chance of survival, citing Smith v. State through Department of Health and Human Resources Administration, supra, and Arant v. St. Francis Medical Center, Inc., 605 So.2d 622 (La. App. 2d Cir.1992), writ denied, 608 So.2d 193 (La.1992). In Smith, the court concluded that the plaintiffs failed to show that there was any loss of a chance of survival. Similarly in Arant, the plaintiffs failed to present evidence to show whether there was a chance of survival if other treatment options had been employed.
In the present case, even though there was conflicting testimony regarding the existence of the loss of a chance of survival, there was testimony that the decedent lost some chance of survival. When the defendants requested that the jury be required to quantify the degree of the loss of a chance of survival, the trial court denied the request. The trial court stated that if there is "any lost chance of survival it's up to the jury to evaluate it without having to quantify it."
While it may have been helpful to have the jury quantify the loss of a chance of survival, we do not find that the failure to require it in the jury verdict form was reversible error. Although the jury did not quantify the percentage of the loss of a chance of survival, Dr. Schuette stated that there was a quantifiable loss of a chance of survival up to 20 percent, while Dr. Cage admitted that the loss of chance of survival was "very minimal." The jury, in its verdict, clearly found that there was a loss of a chance of survival. We cannot say that the jury's finding was manifestly erroneous or clearly wrong. Accordingly, we affirm the jury's finding that Mr. Benefield suffered the loss of a chance of survival due to the breach of the standard of care by Ms. Sibley.

*292 EXCESSIVE DAMAGES
The defendants argue that the award of $260,000.00 for loss of a chance of survival was excessive. This argument is without merit.

Legal Principles
In the determination of general damages, the discretion vested in the trier of fact is "great" and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Hargroder v. Unkel, 39,009 (La.App. 2d Cir.10/29/04), 888 So.2d 953, writs denied, 2004-2908, 2004-2909 (La.2/4/05), 893 So.2d 874.
Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which reasonably could have been made by the trier of fact. Hargroder v. Unkel, supra.
When the chance of survival is less than 50 percent, the court may not award full damages for the loss of life. Rather, the factfinder focuses on the chance of survival that has been lost because of the malpractice and values the lost chance as a lump sum award based on all the evidence in the record, as is done for any other item of general damages. Graham v. Willis-Knighton Medical Center, XXXX-XXXX (La.9/9/97), 699 So.2d 365; Greer v. Lammico, 34,058 (La.App. 2d Cir.12/22/00), 779 So.2d 894, writ denied, XXXX-XXXX (La.4/27/01), 791 So.2d 116.
The starting point of such an analysis is to recognize that the loss of a less-than-even chance of survival is a distinct injury compensable as general damages which cannot be calculated with mathematical certainty. Next, the factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss. The loss of a chance of survival in professional malpractice cases has a value in and of itself that is different from the value of a wrongful death or survival claim. The methodology for fixing damages attributable to the loss of a chance of survival should not be so mechanistic as to require the jury merely to fill in the blanks on a verdict sheet with a consensus number for the percentage chance of survival and the total amount of damages, and then have the judge perform the multiplication task. Smith v. State, Department of Health and Hospitals, XXXX-XXXX (La.6/25/96), 676 So.2d 543.
Loss of support, loss of love and affection, and other wrongful death damages are relevant, but not mathematically determinative, in loss of a chance of survival cases, as is evidence of the percentage chance of survival at the time of the malpractice. The plaintiff may also present evidence of, and argue other factors to the jury, such as that a 10 percent chance of survival may be more significant when reduced from 10 percent to zero than when reduced from 40 to 30 percent. The jury may also consider such factors as that the *293 victim, although not likely to survive, would have lived longer but for the malpractice. Smith v. State, Department of Health and Hospitals, supra.
The jury in a loss of a chance of survival case merely considers the same evidence considered by a jury in a survival and wrongful death action, and the loss-of-chance jury then reaches its general damages award for that loss on that evidence as well as other relevant evidence in the record. Smith v. State, Department of Health and Hospitals, supra. The jury's verdict of a lump sum amount of damages can be tested on appeal for support in the record by reviewing the percentage chances and the losses incurred by the tort victim and his or her heirs, and any other relevant evidence, thus providing assurance against speculative verdicts. Graham v. Willis-Knighton Medical Center, supra; Greer v. Lammico, supra.

Discussion
Mrs. Benefield testified that she and the decedent were married for 34 years and had two sons. Mr. Benefield had been employed as a lift truck operator for the same company for 33 years. She stated that the family was very close. Since Mr. Benefield's death, she reported that their oldest son was depressed, while their younger son had trouble sleeping and had stomach trouble. Mrs. Benefield testified that after her husband's death, she developed high blood pressure and stomach problems. Under the circumstances of this case, taking into account the closeness of the Benefield family, and considering that the decedent's loss of a chance of survival was around 20 percent, we find the award of $260,000 to be high, but not excessive.
In McCrery v. Willis Knighton Medical Center, 29,999 (La.App. 2d Cir.12/10/97), 705 So.2d 753, under very similar circumstances, the plaintiffs were awarded $50,000 following the death of a decedent from a pulmonary embolism where the patient had a 20 percent chance of survival. The court also awarded $60,000 in survival damages, bringing the total award to $110,000. We also note that the McCrery case was decided more than 10 years ago.
In Greer v. Lammico, supra, $100,000 was awarded where the decedent lost a 15 percent or less chance of survival; the physician delayed a mammogram for five months and the decedent died of breast cancer. In Hebert v. Parker, XXXX-XXXX, XXXX-XXXX (La.App. 4th Cir.5/23/01), 796 So.2d 19, writ denied, 2001-2853 (La.11/1/02), 807 So.2d 237, $100,000 was awarded for loss of a chance of survival where the decedent's diagnosis and treatment of lung cancer was delayed by the failure of doctors to inform the decedent of an abnormal chest x-ray.
Based upon the facts of this case and the degree of the loss of a chance of survival, we find that, although the award is high, it is not excessively so. Accordingly, we affirm the jury's award of damages.

MEDICAL MALPRACTICE ACT LIMIT OF LIABILITY
The defendants argue that the trial court erred in failing to limit the liability of Ms. Sibley and Lifeline to $100,000 as required by the LMMA and in finding Lifeline vicariously liable. They contend that La. R.S. 40:1299.42(B)(3) provides that a qualified health care provider is not liable for an amount in excess of $100,000, plus interest, for all malpractice claims because of injuries to or death of any patient. They claim that any amount in excess of $100,000 is to be paid by the PCF.
*294 Lifeline points out that the liability of Lifeline and WKMC is vicarious due to the actions of their employee, Ms. Sibley. Therefore, they argue that Lifeline can only be held liable for the amount owed by Ms. Sibley, and her liability is limited to $100,000. They claim that, even though Ms. Sibley and Lifeline are not qualified health care providers, WKMC is. Because the hospital borrowed Lifeline's employee, Ms. Sibley, the protection of the LMMA should apply, not only to Ms. Sibley, but also to Lifeline. This argument is without merit.
Under facts such as the present case, where a nurse is employed by an agency that contracts to supply labor to a hospital, a dual employer situation exists. Both the labor agency and the hospital are responsible for any malpractice committed by the nurse. See LeCroy v. Interim Health Care Staffing of North Louisiana, Inc., 43,080 (La.App. 2d Cir.4/2/08), 980 So.2d 838; Medical Review Panel Proceedings for the Claim of Tinoco v. Meadowcrest Hospital, XXXX-XXXX (La.App. 4th Cir.9/17/03), 858 So.2d 99.
Therefore, both Lifeline and WKMC are vicariously liable for the negligence of Ms. Sibley. Further, they are jointly liable for the damages. See La. C.C. art. 2324. The parties stipulated that WKMC was a qualified health care provider and covered by the LMMA. That coverage extends to Ms. Sibley as an employee of WKMC. However, Lifeline is not a qualified health care provider and is not covered by the LMMA. No authority has been provided showing that, by virtue of WKMC's coverage of Ms. Sibley, the coverage would be extended to Lifeline. We find that WKMC's liability is limited to the $100,000 medical malpractice cap. Lifeline's liability is not so limited. If Lifeline and the PCF are unable to determine how to cover the additional $160,000 owed to the plaintiffs, the matter shall be decided by the trial court.

CONCLUSION
For the reasons stated above, we affirm the jury verdict and trial court judgment. Costs in this court are assessed to the defendants.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, PEATROSS and MOORE, JJ.
Rehearing denied.
NOTES
[1] Ms. Wagoner was never served and was not considered an active defendant in this case.