Judgment rendered December 14, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,802-CA
No. 54,803-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

YOLANDA TAYLOR, CATINA                        Plaintiffs-Appellees
SMITH, CYNTHIA SMITH, AND
VERNAON TAYLOR,
INDIVIDUALLY AND ON
BEHALF OF DELORES JEAN
BOGAN (D)

versus

NEXION HEALTH AT                              Defendants-Appellants
PIERREMONT, INC., D/B/A
PIERREMONT HEALTHCARE
CENTER - SHREVEPORT,
UNIVERSITY

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 596,655 and 620,077

Honorable Craig O. Marcotte, Judge

* * * * *

CARAWAY LEBLANC, LLC                  Counsel for Appellants,
By: Ann Marie LeBlanc                 Nexion Health at
                                      Pierremont, Inc., D/B/A
                                      Pierremont Healthcare
                                      Center

WALTER CLAWSON

Counsel for Appellants, Louisiana Patient's Compensation Fund & Louisiana Patient's Compensation Fund Oversight Board

PATRICK R. JACKSON, APLC
By: Patrick R. Jackson
      Ryan Goodwin

Counsel for Appellees

\* \* \* \* \*

Before MOORE, STONE, and THOMPSON, JJ.

**THOMPSON, J.**

This loss of chance of survival case arises from the alleged delay of appropriate medical treatment by a hospital due to the unconscious patient arriving from a nursing and rehabilitation center at the emergency room with the medical chart of a different patient. With treatment being partially based on the incorrect information provided, the treating physicians were prevented from having access to the most accurate and pertinent medical history of the patient, which resulted in a delay of the most beneficial treatment for her complex medical history. A medical review panel concluded the nursing facility breached the standard of care by sending the patient with the wrong chart, with the result that the hospital was unaware of the woman's name or patient history for a period of time. A jury found the nursing facility liable for $150,000 in damages for the patient's lost chance of survival, and the defendants now appeal. For the following reasons, we affirm the jury's verdict and damage award.

### FACTS AND PROCEDURAL HISTORY

On September 8, 2015, Delores Jean Bogan ("Bogan") was admitted to Nexion Health at Pierremont, Inc. d/b/a Pierremont Healthcare Center ("Pierremont") for rehabilitation. Bogan was 64 years old and had been in ill health, including dialysis for a number of years. In October, 2015, Bogan received four stents in her cardiac arteries at Willis-Knighton Hospital. On October 15, 2015, Bogan went to University Health-Shreveport/LSU ("LSU") because she was having chest pain. She was informed that she needed a left heart catheterization ("LHC") after experiencing non-ST elevation myocardial infarction ("STEMI"). Bogan declined to have the

LHC surgery that day at LSU and told the doctor she would seek a second opinion from her cardiologist, who was more familiar with her medical history. There was evidence presented at trial that Bogan missed a follow-up appointment with her cardiologist and did not have the procedure.

On November 16, 2015, Bogan collapsed at Pierremont and was unresponsive at 5:41 a.m. The records reflect that by 6:16 or 6:24 a.m. medical personnel were able to obtain a pulse, and she was transported to and arrived at LSU at 6:30 a.m. Pierremont sent Bogan to LSU with the chart of a different patient, that of an 89-year-old woman. The medical review panel found, and Pierremont admits, that sending the incorrect chart with the unconscious Bogan was a breach of the standard of care.

After Bogan was transported to LSU, Pierremont called two of Bogan's daughters, Yolanda Taylor ("Taylor") and Cynthia Smith ("Smith"), and informed them that their mother had collapsed and been taken to LSU. Both women arrived at LSU approximately 30 minutes later and were told that their mother was not a patient at the hospital, confusion which resulted from Bogan being identified as the 89-year-old woman whose chart had accompanied Bogan. At some point during the morning, LSU realized that it had the incorrect paperwork and admitted Bogan as a "Jane Doe." As described below, Bogan's daughters testified that they later returned to LSU and were reunited with their mother.

The parties disagree about the timeline of Bogan's treatment for the remainder of the morning at LSU, particularly the time at which doctors at LSU knew Bogan's name and medical history. Once in the ER, Bogan had

2

blood work drawn and a bedside chest x-ray. At 8:47 a.m., the following note was added to Bogan's chart by her treating physicians:

> Upon further investigation due to inconsistencies with PE and patient's chart, appears that NH sent wrong paperwork with patient and given her unresponsiveness was not able to verify identity. Patient initially charted and treated based on wrong data. This was corrected and noted that patient with recent Stents and Hx of cardiac disease, also 64 yo, not 89 yo. Cardiology reassessed situation and plan for emergent LHC.

Before noon on November 16, 2015, Bogan was taken to the catheterization ("cath") lab and underwent an LHC, during which she experienced heart arrythmias that required she be shocked and a pacemaker was used. The next day, on November 17, 2015, Bogan passed away at LSU.

Bogan's four children, Yolanda Taylor, Catina Smith, Cynthia Smith, and Vernaon Taylor (collectively, "plaintiffs"), brought a medical malpractice complaint with the Patient's Compensation Fund against Pierremont. The Medical Review Panel met on August 7, 2019, and rendered an opinion finding that Pierremont breached the standard of care. However, the panel found that the breach of the standard of care did not affect Bogan's treatment and ultimate outcome. On November 21, 2019, plaintiffs filed suit against Pierremont, and at the jury trial on this matter, the following testimony was adduced.

Taylor testified that Pierremont called her at about 6 a.m. to tell her that her mother had collapsed. She went to LSU and arrived approximately 35 minutes later. She was met by Smith, who informed her that LSU said Bogan was not a patient there. Taylor immediately left LSU and went to Pierremont. Pierremont informed her, sometime between 6:45 a.m. and 7:30

a.m., that Bogan was at LSU but registered as a Jane Doe. Taylor stated that she was estimating all of her timeline of that morning because she was not paying attention to the exact times that everything occurred. Taylor then returned to the hospital and met up with her sister. She testified that Bogan was a mother of four and a grandmother of 12, all of whom she loved dearly. She testified that her mother was active, social, and very involved in her church. She testified how much the family misses Bogan and what her loss has meant to the family.

Smith testified that she received a phone call from Pierremont around 6 a.m. and drove to LSU. She arrived about 30 minutes later, and the hospital told her that her mother was not there. Smith stated that at some point, the nurse at LSU told her that they had found her mother. She was unable to describe how and when they discovered Bogan was there more specifically. Smith testified that she was not able to estimate the specific time when these events occurred but under cross-examination testified that it could have been between 6:50 a.m. and 7:00 a.m.

Plaintiffs called Dr. Jason Reingold, a cardiologist from Atlanta, who testified that it was more likely than not that if LSU doctors had known Bogan's identity and conditions when she arrived at the hospital, they would have had a better chance at saving her life. He testified that there was a possibility of a good outcome when she arrived at the hospital if the stent thrombosis was removed. He stated that the stent thrombosis would have been removed because if the LSU doctors had known her identity, they would have immediately rushed her to the cath lab for an LHC and intervention right after she arrived between 6:30 and 6:40 a.m. Dr. Reingold

4

noted that when cardiology was initially consulted, that doctor assessed the patient's treatment based on the information that she was an 89-year-old with an aortic flap, versus a 64-year-old with recent stent implants, and the treatment between those two patients is going to be different.

Dr. Reingold specifically directed the jury to the 8:47 note by LSU doctors that cardiology had "reassessed the situation." He testified that after this note was made, the doctors pushed anti-platelet medications and Bogan was sent for an emergent LHC. Dr. Reingold testified that he extrapolated that LSU learned of Bogan's medical history at this time and her history was the reason for the reassessment and change in treatment. He testified that due to this delay in diagnosis and treatment, Bogan endured prolonged ischemic time, meaning a loss of blood flow to the heart, which decreased her survival rate. He testified that if LSU had known Bogan's identity and conditions upon her arrival, they would have had a better chance at saving her life.

He opined that LSU would have been able to look up her medical history in the electronic medical record ("EMR"). He testified that Bogan's history, coupled with the EKG done on arrival, would compel this course of treatment. Dr. Reingold testified that Bogan had a posterior STEMI and stated that if the LSU doctors could not electronically access her chart, they could have called doctors from other hospitals to obtain her history. He admitted that he did not know if he could have called other doctors that early in the morning. Dr. Reingold relied on the electronic time-stamped medical records that summarized Bogan's care and treatment and the timing of certain orders when determining there was a three-hour delay in the LSU

5

doctor's determining Bogan's identity. On cross-examination, he could not answer the question of whether she would have survived beyond a day.

Dr. Kenneth McCarron, a member of the medical review panel, testified that he supported the findings of the medical review panel, which were that Pierremont breached the standard of care but that Bogan sustained no damages as a result. He testified that he believed Bogan had no chance of survival due to the prolonged cardiac arrest and her underlying comorbidities. Dr. McCarron supported his opinion by referencing her oxygen level was 33 when she arrived at LSU, when normal oxygenation is in the mid-nineties. He testified that she had essentially died in the field. He found that having the correct paperwork from Pierremont would not have changed her outcome and that with a patient as critically ill as Bogan, doctors treat the patient and not the paperwork. He opined her history of prior cardiac stents was not relevant to the initial treatment and that the EKG done at 6:30 a.m. when she arrived at the hospital determined the treatment protocol, not her stent history. He stated that bringing her prematurely to the cath lab would have hastened her death. He testified that with EMR, documentation is done at a later time, and thus, the timeline relied on by the plaintiffs' expert witness is not reliable. He stated there is nothing in the record to indicate that the LSU doctors delayed intervention because they did not know Bogan's identity or medical history.

Dr. Thanh Nguyen, an interventional cardiologist, was hired by Pierremont as an expert witness. He testified that sending the wrong paperwork did not deprive Bogan of a chance of survival and did not alter her treatment in this case. He testified that, more likely than not, she did not

have a chance of survival. He opined that when she arrived at the hospital, her pupils were not reactive, which means her brain was not working, she was completely unresponsive, which signals poor brain activity, and she was put on a ventilator, which Dr. Nguyen described as life support.

He testified that because her labs showed the lack of oxygen, acidosis, and elevated electrolytes, it was necessary to correct these issues first rather than send her to the cath lab first. Dr. Nguyen told the jury that the time stamps of the physician notes were likely not accurate because doctors do not open the computer to take notes until they complete their care of the patient. He found that the physician notes did not indicate the precise time the LSU doctors learned of Bogan's identity. He further testified that the doctors at LSU were attempting to determine whether Bogan had a pulmonary embolism prior to 10:00 a.m. He testified that there is no evidence in Bogan's medical records that any of Bogan's family members met with doctors until 9:19 a.m.

Dr. Nguyen testified that the nursing home paperwork would not have included her full history, including that part that would have indicated she needed to go to the cath lab. Dr. Nguyen testified that he would have immediately starting pushing Heparin, an anticoagulant, when he saw her EKG that morning. He admitted that the LSU doctors did not push Heparin until 8:50 a.m., which plaintiffs argued comported with their theory that LSU received information regarding Bogan's cardiac condition around 8:30 a.m., a 2 ½- to 3-hour delay caused by Pierremont sending the wrong chart. Finally, Dr. Nguyen testified that LSU did not breach the standard of care in Bogan's treatment.

7

Ultimately, the jury rendered a 9-3 verdict in favor of plaintiffs, finding more probably than not that Bogan had a chance of survival or a better outcome and that she lost that chance of survival or a better outcome due to Pierremont's breach of care. In a 10-2 vote, the jury apportioned all of the fault to Pierremont and awarded damages of $150,000 to the plaintiffs. As noted in the judgment, Pierremont, as a qualified healthcare provider, is not liable for an amount in excess of $100,000 plus interest and costs, pursuant to La. R.S. 40:1231.2(B)(3), and any excess amount shall be paid for by the Louisiana Patient's Compensation Fund. Pierremont and the Louisiana Patient's Compensation Fund and the Louisiana Patient's Compensation Fund Oversight Board (collectively, the "Fund") appeal.[1]

## DISCUSSION

The defendants assert five assignments of error, as discussed below. First, we will consider the controlling medical malpractice law.

The manifest error standard applies to the review of medical malpractice cases. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. *Benefield v. Sibley*, 43,317 (La. App. 2 Cir. 7/9/08), 988 So. 2d 279, *writs denied*, 08-2162 (La. 11/21/08), 996 So. 2d 1107; 08-2210 (La. 11/21/08) 996 So. 2d 1107; 08-2247 (La. 11/21/08), 996 So. 2d 1108. In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further

---

[1] The Fund has incorporated all of Pierremont's arguments into their brief, except for the fifth assignment of error, which they alone argue.

8

determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. *Benefield*, *supra*. The issue to be decided by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Where the factfinder's conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Id.* Where there is conflicting testimony, reasonable inferences of fact should not be disturbed on review. When the jury's findings of fact are reasonable in light of the entire record, an appellate court may not reverse a choice between two permissible views of the evidence. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989); *Greer v. Lammico*, 34,058 (La. App. 2 Cir. 12/22/00), 779 So. 2d 894, *writ denied*, 01-0445 (La. 4/27/01), 791 So. 2d 116.

Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, *i.e.* lessened the chance of survival, is a question of fact for the jury. A substantial factor need not be the only causative factor; it need only increase the risk of harm. *Hastings v. Baton Rouge Gen. Hosp.*, 498 So. 2d 713 (La. 1986). The plaintiff does not have the unreasonable burden of proving that the patient

9

would have lived had proper treatment been given. *Smith v. State through Dep't of Health & Human Res. Admin.*, 523 So. 2d 815 (La. 1988). However, the plaintiff does have the burden of establishing by a preponderance of the evidence that the defendant's conduct denied the patient a chance of survival.

In *Smith*, *supra*, the Supreme Court recognized the right to recover damages for any lost chance of survival and set forth the method of valuation. The court set forth prerequisites to prove the loss of a less than 50% chance of survival. Plaintiffs must show by a preponderance that (1) the victim had a chance to survive at the time of the professional negligence, (2) the tortfeasor's action or inaction deprived the victim of all or part of that chance, and (3) the value of that lost chance. Where there are contradictory expert opinions regarding compliance with the applicable standard of care, the appellate court is bound to give great deference to the conclusions of the trier of fact. *Toston v. St. Francis Med. Ctr., Inc.*, 49,963 (La. App. 2 Cir. 10/14/15), 178 So. 3d 1084.

**First Assignment of Error: The jury was manifestly erroneous in finding that Pierremont's actions in sending the wrong paperwork to LSU was a substantial factor in the outcome because plaintiffs failed to prove a chance of survival existed.**

In their first assignment of error, defendants argue that plaintiffs failed to prove that Bogan had a chance of survival, citing the testimony of Dr. McCarron and Dr. Nguyen. Drs. McCarron and Nguyen testified that, more probably than not, Bogan would not survive based on her prolonged cardiac arrest and her multiple comorbidities. Plaintiffs argue that they carried their burden by presenting evidence to the jury that Bogan improved upon her admission to LSU and that her chart does not note her prognosis as "grim"

until the next day, the day she passed away.  They also note that Dr. Reingold testified to the jury that Bogan had a chance of survival and that the delay in her treatment based on the wrong data being sent with her to the hospital resulted in her having a lower than expected chance of survival.

As noted above, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.  *Benefield*, *supra*.  Where the factfinder's conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.  *Id.*  As such, this court must determine whether the factfinder's conclusion was a reasonable one, not whether the trier of fact was right or wrong.

Here, the jury was presented with evidence from several doctors who had opposing opinions about Bogan's chance of survival when she arrived at LSU.  Plaintiffs presented Dr. Reingold's testimony and the treating physicians' notes at LSU.  Defendants presented testimony from Drs. McCarron and Nguyen that she would likely not survive.  Because conflicting evidence was presented to the jury on both sides of this issue, we cannot say that the jury's decision that Bogan suffered a loss of chance of survival was manifestly erroneous, even if we may not have arrived at the same conclusion.  For this reason, the first assignment of error is without merit.

**Second Assignment of Error: The jury verdict should be reversed because plaintiffs failed to prove if there was a chance of survival, it was**

11

**lost due to Pierremont's conduct either under the manifest error or *de novo* standard of review.**

Defendants contend that the evidence presented to the jury shows that LSU knew Bogan's identity before 7 a.m., citing the timelines provided by Taylor and Smith and notes made by LSU's treating physicians. As such, Pierremont's breach of the standard of care by sending the incorrect chart did not affect Bogan's chance of survival. Plaintiffs argue that it is unclear when LSU determined Bogan's identity and that both Taylor and Smith testified that their timelines were simply estimates. Dr. Reingold testified that he believed LSU determined Bogan's correct identity and medical history several hours after she was admitted and that this delay in her treatment, specifically in sending her to the cath lab, decreased her chance of survival. Plaintiffs also refer to the specific note in Bogan's LSU chart, made at 8:47 a.m., wherein her treating doctors stated:

> Upon further investigation due to inconsistencies with PE and patient's chart, appears that NH sent wrong paperwork with patient and given her unresponsiveness was not able to verify identity. Patient initially charted and treated based on wrong data. This was corrected and noted that patient with recent Stents and Hx of cardiac disease, also 64 yo, not 89 yo. Cardiology reassessed situation and plan for emergent LHC.

Plaintiffs urged the jury that the term "reassessed" indicates that cardiology had already assessed Bogan when she was admitted and had to reassess when they knew her identity and medical history. After the reassessment, Bogan was sent for an emergency LHC.

The parties further argued before the jury about whether LSU would have been capable of accessing Bogan's medical records immediately upon her arrival, via EMR. Plaintiffs presented evidence from her LSU chart that indicated an EMR existed at the time at LSU, the only level 1 trauma center

in the area. Dr. Nguyen testified that his hospital in New Orleans, Louisiana, had an EMR system in 2015.[2] Pierremont correctly notes that there is no definitive evidence that LSU had access to EMR at the time of Bogan's hospital stay.

Again, in the case of conflicting testimony, this court must give deference to the findings of the jury. Where there is conflicting testimony, reasonable inferences of fact should not be disturbed on review. When the jury's findings of fact are reasonable in light of the entire record, an appellate court may not reverse a choice between two permissible views of the evidence. *Rosell*, *supra*. The effect and weight to be given expert testimony is within the broad discretion of the factfinder. *Harris*, *supra*.

As noted by both parties, there was no definitive answer presented to the jury on the question of when LSU doctors discovered that the patient in their care was actually Bogan or when they were able to access her medical history. Both parties presented expert medical testimony regarding the course of her treatment at LSU and whether that treatment would have changed had her treating doctors known her medical history. Both parties presented the jury with argument regarding the timeline of events noted in Bogan's LSU chart, including the note made by Dr. Foster and Dr. Baker that "patient initially charted and treated based on wrong data…Cardiology reassessed situation and plan for emergent LHC."

---

[2] Although not included in the assignments of error, defendants seem to be challenging the trial court's admission of Dr. Nguyen's testimony that in 2015, the hospital he worked at in New Orleans had access to EMR. The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of discretion. *Harris v. Holliway Med. Clinic*, 54,697 (La. App. 2 Cir. 8/10/22), 345 So. 3d 452. We do not find the admission of this testimony was an abuse of discretion.

Considering the conflicting evidence and testimony presented, we cannot say that the jury was manifestly erroneous in its determination that Bogan's loss of chance of survival was caused by Pierremont's breach of the standard of care. This assignment of error is without merit.

**Third and Fifth Assignments of Error: The Jury was manifestly erroneous in not finding LSU at fault, and in not finding Bogan was comparatively at fault and contributed to her deprived chance of survival.**

As the third and fifth assignments of error both involve the jury's apportionment of fault, we have addressed them together below.

Defendants argue that the jury was manifestly erroneous in not finding LSU at fault because if there was a delay in performing an LHC on Bogan, then that delay was the fault of the LSU doctors. They contend that if Dr. Reingold's theory is correct that Bogan needed immediate treatment at the cath lab upon admission to LSU, then it was LSU's responsibility to provide her with that treatment. Plaintiffs argue that there was no testimony or evidence presented that LSU breached the standard of care, and defendants' own expert testified that LSU did not breach the standard of care.

Similarly, the Fund argues that the jury was manifestly erroneous in not finding Bogan comparatively at fault for her death because evidence was presented that she was informed in October that she would need to undergo an LHC. Bogan declined to have the surgery at that time, stating that she wanted to see her own cardiologist first. The Fund argues that she contributed to her death because she did not see her cardiologist prior to her collapse at the nursing home in November.

The trier of fact will compare the relative fault of the parties in the assessment of liability. *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So. 2d 967 (La. 1985); *Upchurch v. State ex rel. La. Dept. of Transp. & Dev.*, 48,354 (La. App. 2 Cir. 8/7/13), 123 So. 3d 228, *writ denied*, 13-2153 (La. 11/22/13), 126 So. 3d 489. The amount of fault, if any, attributable to any party and the apportionment of it, is a question of fact to be decided by the trier of fact. *Upchurch*, *supra*. A trier of fact's allocation of fault is subject to the manifest error/clearly wrong standard of review. *Hebert v. Rapides Parish Police Jury*, 06-2001 (La. 4/11/07), 974 So. 2d 635. The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong. *Clement v. Frey*, 95-1163 (La. 1/16/96), 666 So. 2d 607; *Upchurch*, *supra*. Fault allocation is a factual determination and the trier of fact, unlike the appellate court, has the benefit of viewing firsthand the witnesses and evidence. *Id.*

Here, there is no manifest error in the jury's determination to allocate no fault to LSU, as there is no evidence that LSU breached the standard of care. Even defendants' own expert witness testified that LSU did not breach the standard of care. As to any potential fault on the part of Bogan, the jury heard argument and was presented evidence that Bogan did not visit her cardiologist prior to her collapse at Pierremont. It is not unreasonable that the jury chose not to allocate any fault to Bogan in this matter. For the foregoing reasons, we find the third and fifth assignments of error to be without merit.

**Fourth Assignment of Error: The award of damages in the amount of $150,000 was clearly wrong.**

Defendants argue that plaintiffs failed to prove the value of the lost chance of survival. They contend Bogan had no survival damages and that her heirs did not provide enough evidence of their loss.

We find this argument to be without merit. In the determination of general damages, the discretion vested in the trier of fact is "great" and even vast, so that an appellate court should rarely disturb such an award. *Youn v. Maritime Overseas Corp.*, 623 So. 2d 1257 (La. 1993), *cert. denied*, 510 U.S. 1114, 114 S. Ct. 1059, 127 L.Ed. 2d 379 (1994); *Allen v. Bookshire Grocery Co.*, 40,951 (La. App. 2 Cir. 4/20/06), 927 So. 2d 693. It is only when the award is beyond what a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff, under the particular circumstances that the appellate court should increase or reduce the award. *Benefield*, *supra*. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which reasonably could have been made by the trier of fact. *Id.*

When the chance of survival is less than 50 percent, the court may not award full damages for the loss of life. Rather, the factfinder focuses on the chance of survival that has been lost because of the malpractice and values the lost chance as a lump sum award based on all the evidence in the record, as is done for any other item of general damages. *Graham v. Willis-Knighton Med. Ctr.*, 97-0188 (La. 9/9/97), 699 So. 2d 365; *Benefield*, *supra*.

The starting point of such an analysis is to recognize that the loss of a less-than-even chance of survival is a distinct injury compensable as general

16

damages, which cannot be calculated with mathematical certainty. Next, the factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss. The loss of a chance of survival in professional malpractice cases has a value in and of itself that is different from the value of a wrongful death or survival claim. The methodology for fixing damages attributable to the loss of a chance of survival should not be so mechanistic as to require the jury merely to fill in the blanks on a verdict sheet with a consensus number for the percentage chance of survival and the total amount of damages, and then have the judge perform the multiplication task. *Smith, supra*.

Loss of support, loss of love and affection, and other wrongful death damages are relevant, but not mathematically determinative, in loss of a chance of survival cases, as is evidence of the percentage chance of survival at the time of the malpractice. The jury may also consider such factors as that the victim, although not likely to survive, would have lived longer but for the malpractice. *Smith*, *supra*. The Louisiana Supreme Court has stated that "the jury will be allowed to consider an abundance of evidence and factors, including evidence of percentages of chance of survival along with evidence such as loss of support and loss of love and affection, and any other evidence bearing on the value of the lost chance." *Smith*, *supra*. The jury's verdict of a lump sum amount of damages can be tested on appeal for support in the record by reviewing the percentage chances and the losses incurred by the tort victim and his or her heirs, and any other relevant evidence, thus providing assurance against speculative verdicts.

17

A review of the record indicates that there was sufficient evidence presented for the jury to determine that Bogan suffered a loss of chance valued at $150,000. Two of her daughters testified about how devoted Bogan was to her family and her grandchildren. They testified about how she was active and friendly. They testified about how Bogan entered Pierremont for rehabilitation, and they expected her to leave the facility when her rehabilitation was completed. The jury heard testimony regarding their search for their mother on the morning she collapsed and how she was listed as a Jane Doe at LSU. When considering the record as a whole, we find the $150,000 award is not excessive. This assignment of error is without merit.

**CONCLUSION**

For the foregoing reasons, we affirm the trial court's verdict and damage award. Costs of this appeal, totaling $2,571.50, are assessed to Nexion Health at Pierremont, Inc. d/b/a Pierremont Healthcare Center and the Louisiana Patient's Compensation Fund and the Louisiana Patient's Compensation Fund Oversight Board.

**AFFIRMED.**