DREW, J.
| this action brought by a patient’s children against two hospitals, the treatment rendered at the hospitals is not at issue. Rather, it is the decision by one hospital to accept the patient for transfer and the decision by another hospital to accept the patient for transfer momentarily before denying the transfer that are at the core of this lawsuit. The children appeal summary judgments dismissing their claims. We reverse in part and affirm in part the summary judgment in favor of one hospital, and reverse the summary judgment in favor of the other hospital.
FACTS
Annette Toston went to the Emergency Room (“ER”) at West Carroll Hospital at 3:25 a.m. on Sunday, November 24, 2002, with complaints of left flank pain, fever, chills, nausea, and having vomited three times at home. Toston, 44 at the time and with no major health issues, was examined by Dr. Ruby Jean L. Toe Hio, an internal medicine physician.
Toston told Dr. Hio that she had the urge to urinate, but was unable to do so, although her urine output had been normal prior to that day. Dr. Hio noted that Toston was tender in the left lower quadrant of her abdomen and in her left flank. Toston’s vital signs upon entering the ER were blood pressure of 76/53, pulse of 129, temperature of 101.6°, and normal oxygen levels.
An abdominal X-ray taken at West Carroll showed large staghorn calculi throughout the collecting system of the right kidney, a calculus in the left kidney, and a calculus in the left ureter that was probably obstructing it.
bToston’s temperature climbed as high as 103.1° during the morning at West Carroll, but it had dropped to 98.2° by 8:40 a.m. Her blood pressure at that time had dropped to 70/50 from a high of 86/53 at 3:35 a.m. Her creatinine level measured in the high range at 3.1. Her BUN (blood urea nitrogen) was measured at 22, which while not elevated, was at the high end of the normal range. Dr. Hio’s diagnosis was acute pyelonephritis, kidney stones, possible sepsis, and low blood pressure. Toston received IV fluids at West Carroll, but she did not receive any antibiotics.
Dr. Hio recognized that Toston’s condition required a higher level of care than West Carroll could provide, so she contacted Conway, the LSU Hospital in Monroe, in order to transfer Toston there. She spoke with Dr. Patrick Flyte, a family practice resident at Conway.[1] Dr. Hio told Dr. Flyte that Toston’s blood pressure was low, but she was awake and talking, and except for slight lightheadedness, was asymptomatic. She also informed Dr. Flyte of the lab results, and that urinalysis showed infection, and that X-rays showed kidney stones.
In addition to being told about the X-ray, lab, and urinalysis results, Dr. Flyte recalled being told by Dr. Hio that To-ston’s vital signs were blood pressure of 86/53, pulse of 129, temperature of 101.6°, and oxygen saturation of 99%. Dr. Flyte accepted Toston’s transfer, and the nursing supervisor at Conway informed West Carroll at 7:32 a.m. that the transfer had been accepted. Toston left West Carroll by ambulance at 8:40 a.m. She arrived at Conway at 11:00 a.m. on November 24.
IsToston’s vital signs initially taken at Conway were blood pressure of 58/34, pulse of 74, respiration of 18, and temperature of 97.7°. Toston’s BUN had in *200 creased to 81, and her creatinine level had gone up to 3.8. Dr. Flyte called Dr. Uma Rangaraj at 11:45 a.m. to give his report on Toston. Dr. Rangaraj, an internal medicine physician who supervised the family practice residents at Conway, instructed Dr. Flyte to call the Urology Department at LSU Hospital in Shreveport (“LSU”), explain that Toston was in acute renal failure with probable obstructive ne-phropathy sepsis, and request an immediate transfer for surgical intervention. Conway lacked the capability to provide dialysis or urological surgery.
Dr. Flyte placed the call to LSU at 2:00 p.m. Dr. Carico at LSU returned his call in 10-15 minutes and said he needed a CT of Toston’s pelvis and abdomen. Dr. Cari-co also said that he would not accept the transfer while Toston’s blood pressure and pulse remained low.
A CT of Toston’s abdomen and pelvis was interpreted by Dr. Boyette, a radiologist. He found renal stones bilaterally with hydronephrosis bilaterally, worse on the right than on the left, positive obstruction on the left side, stones in both ureters with obstruction and hypodensity in both kidneys.
Toston was given IV fluids in the ER at Conway to raise her blood pressure. Her vital signs at 5:00 p.m. were blood pressure of 110/78, pulse of 159, respiration of 18, and temperature of 102.2°. Her vital signs an hour later were blood pressure of 63/28, pulse of 139, and respiration of 25.
|4Pr. Flyte called Dr. Carico at 5:45 p.m. to relay the CT results. Dr. Carico asked for Toston’s vital signs. When told the vital signs read at 6:00 p.m., Dr. Carico again said that he could not accept the transfer since Toston’s blood pressure remained low. He recommended that Dr. Flyte treat Toston with antibiotics and fluid, and once she became stable, LSU would accept the transfer.
Dr. Flyte called Dr. Rangaraj about To-ston’s current condition and told her what Dr. Carico told him. Dr. Rangaraj realized that Toston was apparently in full septic shock with worsening renal failure. She told Dr. Flyte that she would call local hospitals for a transfer as she felt that Toston was in no condition at the time to make the long trip to Shreveport. Dr. Rangaraj did not think it was unreasonable for Dr. Carico to want Toston’s blood pressure raised before he would accept the transfer.
Dr. Rangaraj, who was not present at Conway, had assumed that the transfer to LSU had already taken place before Dr. Flyte called her. She said she became angry when Dr. Flyte told her that LSU wanted to see a CT report before approving the transfer. She stated that if she had known Dr. Carico wanted the CT, then she would have exerted authority to push him to accept the transfer or she would have started looking for a local hospital earlier.
Dr. Rangaraj called Dr. Herschel Har-ter, a nephrologist who was on call for St. Francis. Dr. Harter said that he would do dialysis at any facility, but he needed a surgeon to drain the kidney. Dr. John Michael Cage, a urologist, agreed to perform whatever urological surgery was needed by | /Toston. St. Francis Medical Center in Monroe accepted the transfer of Toston at some time prior to 8:00 p.m. Shortly after 8:00 p.m., the nursing supervisor from St. Francis informed Conway that it could not accept the transfer as no ICU bed was available at St. Francis.
Toston was admitted to the ICU at Conway with a diagnosis of septic shock, hy-dronephrosis, and acute renal failure. Dr. Rangaraj frantically tried to arrange a transfer to another hospital. Glenwood and North Monroe were called, but they *201 did not have available bed space. Dr. Rangaraj was running out of options, so she was willing to send Toston to Shreveport even though Toston remained unstable. Willis-Knighton in Shreveport agreed to take Toston, but while Conway was preparing Toston for transfer, the doctor at Willis-Knighton called back at around 1:00 a.m. to say he had changed his mind. Dr. Rangaraj even called Dr. Boy-ette about assisting her in inserting a needle under CT guidance to drain Toston, but Dr. Boyette was uncomfortable in doing that procedure, so it never happened.
Dr. Rangaraj instructed Dr. Flyte at 11:00 p.m. to intubate Toston, who was in stable but guarded condition. Toston coded at 7:00 a.m. on Monday, November 25. Dr. Rangaraj went to Conway within an hour after learning of the code. She then called Dr. Harter to inquire about what had happened to the bed at St. Francis. Dr. Harter said he would contact Dr. Arthur Liles and get him to call her. According to Dr. Rangaraj, Dr. Liles was angry about what had happened and told her to send Toston to St. Francis.
|fiSt. Francis accepted the transfer of Toston on Monday morning, and she arrived there at 11:25 a.m. Dr. Rangaraj thought that Dr. Harter and Dr. Liles exerted pressure to have an ICU bed made available for Toston. Upon her arrival at St. Francis, Toston was unresponsive, as well as hypotensive with evidence of congestive heart failure and volume overload. Toston went into surgery for the placement of bilateral ureter stents by Dr. Cage, but put out only a small amount of urine following the procedure. Dr. Michael Hand, a nephrologist, attempted dialysis, but Toston was unable to tolerate dialysis because of her low blood pressure. Toston coded at 2:40 p.m. She subsequently coded a second time, which was essentially a continuous code until she died at 5:10 p.m. on November 25. The cause of her death was urosepsis.
Lateea Toston, who is Toston’s daughter, filed a request for a medical review panel (“MRP”) on behalf of herself and her six sisters for alleged malpractice by Conway. The MRP concluded that the evidence did not support the conclusion that Conway or any of its employees failed to meet the applicable standard of care in its treatment of Toston. The MRP reasoned that:
Based upon the information received by Dr. Flyte from Dr. Hio, it was appropriate for Dr. Flyte to have accepted transfer of Annette Toston from West Carroll Hospital to LSU Health Sciences Center in Monroe. Although the patient’s vital signs were abnormal with a low blood pressure, Dr. Flyte was informed that the patient was stable, awake and talking. Annette Toston needed a higher level of care than that able to be furnished at West Carroll Hospital and based upon the information provided at that time to Dr. Flyte, it appeared that LSU could deliver the needed level of care. Once the patient arrived at LSU, they correctly assessed the patient’s condition and further provided the appropriate care needed at that time 17until transferred. The staff at LSU made every effort to transfer the patient once it became apparent that the patient needed urological intervention.
Lateea Toston, individually and on behalf of her six sisters, filed a survival and wrongful death action against St. Francis Medical Center and the State of Louisiana. The plaintiffs alleged that Conway had been negligent in accepting the transfer of Toston when Dr. Flyte knew Conway could not provide the urological services required to treat her properly and save her life, while also knowing that the transfer of Toston from Conway to a hospital *202 that could offer those services might not be possible within the time available to save her life.
It was further alleged in the petition that St. Francis had available beds on the evening of November 24, and that lifesaving urological surgery could have been performed on Toston at St. Francis if the nursing supervisor had not canceled the transfer. The plaintiffs contended that the action of St. Francis in canceling Toston’s transfer cost Toston her life and was a violation of Louisiana’s antidumping laws, La. R.S. 40:2113.4, et seq., and other applicable standards and/or statutes.
St. Francis filed a motion for partial summary judgment in which it contended that there was no genuine issue of material fact regarding an alleged violation of La. R.S. 40:2118.4, et seq., and other applicable statutes. St. Francis sought a declaration that the state and federal antidumping statutes do not apply to the allegations against St. Francis, and that the allegations against it fall under the MMA. St. Francis argued that if it had a duty to accept Toston on November 24, then the issue is one of | «delay of treatment under the MMA and not patient dumping for lack of insurance or inability to pay.
Conway also filed a motion for summary judgment, contending that the plaintiffs had not produced an expert to establish they could meet their evidentiary burden at trial. Conway further contended that the plaintiffs had not produced any evidence that it failed to use reasonable care and diligence with respect to its acceptance and treatment of Toston, or that any of the conduct alleged in the petition caused any damage to Toston that would not have otherwise occurred.
St. Francis subsequently filed a full motion for summary judgment in which it contended there was no genuine issue of material fact that Toston had any chance of survival before an attempt was made to transfer her to St. Francis. St. Francis asserted that Dr. Cage testified in his deposition that Toston would not have survived even if he had been able to insert the stents when she first arrived at Conway as nothing he could have done would have changed the outcome. St. Francis argued that the Louisiana antidumping laws do not apply in this matter, Toston’s claims fall under the MMA, and Toston had not come forward with a medical expert with knowledge of all the treatment who could contradict Dr. Cage’s opinion that there would not have been any other outcome for Toston regardless of when she was transferred to St. Francis.
Conway then filed a supplemental memorandum in support of its motion for summary judgment to adopt St. Francis’s arguments and attach Dr. Cage’s deposition.
|flThe plaintiffs filed a supplemental memorandum in opposition to Conway’s and St. Francis’s motions for summary judgment in which they attached the deposition of Dr. Michael Hand. Plaintiffs argued that there was a genuine issue of material fact concerning whether Toston would have survived or had a chance of surviving but for the conduct of defendants.
The trial court granted Conway’s and St. Francis’s motions for summary judgment and dismissed plaintiffs’ claims. They have appealed.
DISCUSSION

Antidumping Law

Plaintiffs contend that St. Francis violated Louisiana’s antidumping law when it cancelled the transfer after initially accepting it and delayed providing emergency surgery. St. Francis argues that plaintiffs’ claims are more properly under the *203 MMA regarding a delay in treatment. La. R.S. 40:1299.41(A)(13) includes the failure to render services timely within the definition of medical malpractice.
Once Dr. Cage agreed to perform the surgery, it was up to James Harrist, the nursing supervisor at St. Francis, to determine whether or not there was an ICU bed available.[2] Toston’s name was written on the admission log on November 24 to signify that there had been a request for placement in a bed and that St. Francis was checking bed availability. That was the standard operating procedure for St. Francis. For some reason that Harrist could not remember, he later wrote “canceled” next to Toston’s name.
| mSix of eight beds in the St. Francis surgical ICU (“SICU”) were occupied on November 24. Harrist was unsure if he considered Toston for a SICU bed, and he did not have the staffing records to determine if the SICU was fully staffed that evening. Harrist did not know if Dr. Cage had asked for a SICU bed, or if a bed in regular ICU was needed. Harrist explained that the fact that Toston was going to surgery did not necessarily mean she would go to a SICU bed. Harrist added that having sepsis would have disqualified Toston from SICU.
Dr. Cage stated that he spoke to the ER staff at St. Francis on Sunday night and was told that the nursing supervisor had determined there was no available bed. Dr. Flyte noted in his report that the transfer to St. Francis had been canceled after St. Francis realized it did not have an ICU bed available.
Louisiana enacted La. R.S. 40:2113.4-2118.6 (“antidumping law”) to establish a statutory duty on the part of certain hospitals to provide emergency services to all persons residing in the territorial area regardless of whether they are insured or able to pay. Spradlin v. Acadia-St. Landry Medical Found., 1998-1977 (La.2/29/00), 758 So.2d 116. The anti-dumping law is the statutory counterpart to the federal law known as the Emergency Medical Treatment and Active Labor Act (“EMTALA”), 42 U.S.C. § 1395dd.
Toston cites La. R.S. 40:2113.4, which provides, in relevant part:
A. Any general hospital ... shall make its emergency services available to all persons residing in the territorial area of the hospital regardless of whether the person is covered by private, federal Medicare or Medicaid, or other insurance. Each person | T1 shall receive these services free from discrimination based on race, religion, or national ancestry and from arbitrary, capricious, or unreasonable discrimination based on ... economic status. However, in no event shall emergency treatment be denied to anyone on account of inability to pay[.]
B. For purposes of this Section, “emergency” means a physical condition which places the person in imminent danger of death or permanent disability.... “Emergency services” means those services which are available in the emergency room and surgical units in order to sustain the person’s life and prevent disablement until the person is in condition to be able to travel to another appropriate facility without undue risk of serious harm to the person[.]
In addition, La. R.S. 40:2113.6 provides in part:
A. (1) No officer, employee, or member of the medical staff of a hospital li *204 censed by the Department of Health and Hospitals shall deny emergency services available at the hospital to a person diagnosed by a licensed physician as requiring emergency services because the person is unable to establish his ability to pay for the services!!] In addition, the person needing the services shall not be subjected by any such person to arbitrary, capricious, or unreasonable discrimination based on ... economic status.
C. “Emergency services” means services that are usually and customarily available at the respective hospital and that must be provided immediately to stabilize a medical condition which, if not stabilized, could reasonably be expected to result in the loss of the person’s life, serious permanent disfigurement or loss or impairment of the function of a bodily member or organ[.]
The supreme court has recognized that the antidumping law does not contain an express private cause of action, and three times it has declined to decide whether our statutory scheme can form the basis for a private cause of action under general tort law. Coleman v. Deno, 2001-1517 (La.1/25/02), 813 So.2d 303. However, we pretermit a determination of |12whether the antidumping law provides a private cause of action because the law is not applicable to this matter.
The plaintiffs incorrectly argue that this case falls under the “emergency services” provisions of the antidumping law. Patient dumping had been defined as generally the “refusal to treat patients with emergency medical conditions who are uninsured and cannot pay for medical treatment or the transfer of such patients to a public hospital.” Spradlin, 1998-1977 at p. 1, n. 1, 758 So.2d at 117. Notably, the antidumping law does not contain a provision prohibiting the practice known as reverse-dumping, which is what occurred in this case. Such a provision is found in the EMTALA. 42 U.S.C.A. § 1395dd states in subsection (g):
A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.
Plaintiffs assert in their brief to this court that no claim is being brought under federal law.
There is no genuine issue of material fact that plaintiffs have no claim against St. Francis under the antidumping law as that law does not apply to the situation at hand where St. Francis canceled the transfer after originally accepting the transfer. Any cause of action that plaintiffs have against St. Francis sounds in medical malpractice.

11SMedical Malpractice

To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794; Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Pfiffner v. Correa, *205 94-0924, (La.10/17/94), 643 So.2d 1228; Samaha, supra.

St. Francis

While Dr. Cage thought Toston’s infection was acute, he felt that she had chronic renal failure and had been obstructed for a long period of time as evidenced by her creatinine and BUN levels. Dr. Cage did not think that Toston was completely blocked on both sides.[3]
Dr. Cage believed that Toston had stopped putting out urine not because she was obstructed, but because the infection had caused a significant drop in blood pressure. Once the blood pressure dropped and became too low to profuse Toston’s kidneys, the kidneys stopped filtering and her urine output diminished greatly. Dr. Cage stated that the fact there was minimal urine output after he placed the stents showed that the kidneys had shut down because Toston was in shock from the infection. Dr. Cage Instated that even though he had told Dr. Rangaraj that he agreed that Toston needed stents to save her, he had not looked at her records when he said that.
Dr. Cage believed that Toston was already septic when she arrived at West Carroll because of her fever and low blood pressure. He thought the kidneys may have shut down before Toston went to West Carroll, but he did not know for certain. Dr. Cage testified that it was crucial that Toston’s blood pressure be increased, that she receive antibiotics, and that she become stabilized and brought out of shock. In that regard, he felt that the care at Conway was more critical to her survival than getting surgery at St. Francis.
Dr. Cage thought that Toston would have survived if doctors had been able to raise her blood pressure, eliminate the sepsis, and get her urine output going. Although Toston was not stable when he placed the stents, he did the procedure as a last-ditch effort to see if he could obtain some urine output. Dr. Cage, who thought Toston was going to die when he did the stent surgery, was hoping that by placing the stents and getting her urine flowing, the sepsis would be reduced because bacteria would leave the body in the urine instead of going back into her bloodstream.
Dr. Cage agreed that while Toston’s condition worsened from the time that St. Francis denied the transfer until the stents were placed, placing the stents earlier would not have improved her chances of survival because her blood pressure was too low for Toston to make urine in the first place. Dr. Cage noted that her blood pressure was 60/28 at 6:00 p.m. on Sunday, 115and it was not much different the next day when he placed the stents. The problem was not the obstruction, but the kidney failure caused by the infection and low blood pressure. According to Dr. Cage, the efforts to stabilize Toston at Conway were what would have been done at St. Francis had she gone there earlier.
Dr. Cage disagreed with Dr. Rangaraj’s assessment that Toston could have lived had the stents been placed earlier. He asserted that what he knew that Dr. Ran-garaj did not know was that the stents made no difference and did not work.
Dr. Hand thought that Toston had been transferred to St. Francis for dialysis to treat acute renal failure; he placed her on antibiotics. After Toston’s blood pressure and pulse dropped, Dr. Hand gave her medications that temporarily raised them.
Dr. Hand was unable to successfully dia-lyze Toston because her blood pressure *206 was too low, and Toston coded when she was placed on the dialysis machine. Dr. Cage thought dialysis probably would have been more helpful to Toston than the stents. However, Dr. Cage did not think the delay in attempting dialysis had any effect because Toston could not handle the dialysis.
Dr. Cage stated that Toston’s chances for survival were slim and none if St. Francis had initially accepted the transfer. That was because Toston never responded to any of the efforts (pressor agents, transfusions, IV fluids, and antibiotics) used to bring her pressure up and stabilize her. Stents and dialysis would not have worked, if at all, until she was stabilized.
11fiDr. Hand thought that Toston developed a urinary tract infection when the stones blocked the flow of urine. As the infection spread from the urinary tract, the infection became sepsis, which ultimately killed Toston.
Dr. Hand estimated Toston’s chance of survival upon arrival at St. Francis as close to zero and less than 5%. The stents did not make a difference because she was already in renal failure from the low blood pressure. Dr. Hand did not know if To-ston’s death could have been prevented had she been transferred to St. Francis earlier because he did not have her medical records, and he was unsure of her condition at West Carroll. Nevertheless, he thought Toston’s chances of surviving would have been better with earlier intervention.
By the time Dr. Flyte received the radiology reports from Dr. Boyette, his diagnosis was urosepsis and acute renal failure, and he believed she needed emergency surgery to remove the blockages. He thought the sooner the surgery was performed, the better it would have been for Toston. Dr. Rangaraj thought that Toston would survive the first time St. Francis accepted the transfer because Conway had done all that it could for Toston, and St. Francis would provide the services that she needed.
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, supra. A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is l ^appropriate, ie., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Id.
A genuine issue exists where reasonable persons, after considering the evidence, could disagree. In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony or weigh evidence. Property Ins. Ass’n of La. v. Theriot, 2009-1152 (La.3/16/10), 31 So.3d 1012.
As this court cannot weigh evidence on a motion for summary judgment, it cannot give more credence to Dr. Cage over Dr. Flyte or Dr. Rangaraj because he is a urologist and actually performed the surgery that the Conway doctors believed that Toston desperately needed. As such, a genuine issue of material fact remains as to whether the delay in treatment caused by St. Francis’s cancellation of the transfer after accepting the transfer diminished Toston’s chances of surviving her ordeal.

Conway

The issue is not whether the doctors at Conway committed medical malpractice in their treatment of Toston, but whether malpractice occurred when Dr. Flyte accepted the transfer. Dr. Cage stated that Toston needed to be stabilized *207 and brought out of shock. Toston was given fluids, antibiotics, and pressor agents at Conway in an effort to stabilize her.
According to Dr. Cage, Toston still had a chance of survival when she went to West Carroll. However, the fluids she received at West Carroll and the fluids, pressor agents, and antibiotics that she received at Conway never helped get her out of shock.
118Pr. Hio, who generally worked in the ER, was not familiar with the services at area hospitals. She looked at the X-ray films before they were sent to the radiologist and saw kidney stones on both sides. Based upon the lab work, X-rays and clinical presentation, Dr. Hio thought Toston had a urinary tract infection with the kidney stones possibly being the source. Although Dr. Hio thought the stones could have been impairing Toston’s renal function, she did not think Toston was in renal failure.
Dr. Hio said that she did not start To-ston on antibiotics because Toston was not in any distress, her white count was normal, her fever was coming down, and Dr. Hio was focused on the infection being related to the stones and getting her transferred. Toston was given fluids, Tylenol, and Toradol while at West Carroll.
Toston felt better than when she had first arrived at West Carroll. Although her blood pressure had dropped and she felt slightly lightheaded, she was not in any distress or having shortness of breath. Dr. Hio was not overly concerned about the low blood pressure because Toston’s heart rate was high and she had been receiving fluids.
Dr. Hio thought Toston was clinically stable at the time of transfer. Dr. Hio sought the transfer because Toston had a urinary tract infection which was probably caused by the stones, and she needed a higher level of care than West Carroll could provide since it did not have a urologist on staff and could not provide surgical services. Dr. Hio thought Toston needed intervention to remove the stones, but whether it was going to be immediate intervention or later would be up to the specialist. Dr. Hio said l1flshe told Dr. Flyte that she thought the elevated creati-nine level was probably caused by the obstruction.
Dr. Flyte stated that although Toston’s blood pressure was very low, Dr. Hio assured him that Toston was clinically stable, alert, and oriented. Dr. Flyte testified in his deposition that he told Dr. Hio that it looked like Toston may need dialysis, but Dr. Hio indicated that the renal insufficiency appeared to be an acute onset from acute pyelonephritis. He wrote in his report that he explained to Dr. Hio that Conway did not provide dialysis. Conway contends that Dr. Flyte accepted the transfer based on Dr. Hio’s assurances about Toston’s condition.
Dr. Hio denied that anyone at Conway told her that dialysis could not be performed there. She was not sure if she even discussed dialysis with Dr. Flyte. She thought Toston was more likely to need surgery rather than dialysis at some point. Dr. Hio could not recall anyone at Conway telling her that the stones could not be surgically removed at Conway. She assumed that Conway could remove the stones if necessary since Dr. Flyte accepted the transfer. Dr. Hio had never been to Conway and was unfamiliar with its size. Dr. Hio testified that she probably thought when she made the transfer that Conway had the capability to remove the stones surgically or provide dialysis if needed, as otherwise she would not have transferred Toston there.
Dr. Flyte thought that Toston had been healthy before becoming acutely ill and *208 needed to be put in an ICU, where she would be closely monitored and receive IV antibiotics and fluids to become stable. Dr. Flyte Rpwanted to give Dr. Hio the benefit of the doubt about Toston’s condition when he accepted the transfer because West Carroll did not have an ICU and Conway could provide the ICU services to treat Toston immediately. Dr. Flyte felt that Toston more likely would have survived if she could have undergone surgery within a few hours after he received Dr. Boyette’s report on Sunday.
Dr. Flyte wrote in his report that after Toston arrived at Conway and was examined, he realized that he had mistakenly accepted Toston in acute renal failure. Dr. Flyte explained in his deposition that he was not saying that he should have declined the transfer. He said what he meant was that even though Conway gave Toston a higher level of care than West Carroll could provide, she ultimately needed to be transferred to another facility for surgery.
According to Dr. Cage, Toston’s vital signs showed that she was in shock when she went to West Carroll, and she needed to go to a hospital where her condition could be stabilized. Dr. Cage felt that even though Dr. Flyte knew about the stones as well as the creatinine and BUN levels, it was appropriate for him to accept the transfer because Conway offered better care than West Carroll. A rural hospital like West Carroll could begin the stabilization process, but it was not equipped to handle severe sepsis. Even though Conway did not have a urologist and urological care was important, that concern was secondary to stabilization. Conway had what Toston needed to become stable and treat her sepsis.
121Pr. Cage did not think that it would have made a difference if Toston had gone straight to St. Francis from Conway to receive dialysis because she was still in shock. Dr. Rangaraj thought that Toston needed to have the stones removed to drain her kidneys because that was why she was septic and had low blood pressure. She thought that Toston would have likely survived if she had been transferred to St. Francis or a hospital that could provide urological surgery or dialysis instead of being sent to Conway.
Dr. Hand testified that someone with kidney stones does not automatically need dialysis or surgery. Dr. Hand thought it was rare that bilateral obstruction would occur and that dialysis would be required. Dr. Hand noted that if Dr. Hio had told Dr. Flyte that she had kidney stones, probable kidney infection, and her condition was unstable, then he should have known she probably had sepsis. However, that still would not have been enough information for Dr. Flyte to automatically think that Toston needed dialysis or surgery at that point, as someone with stones and sepsis may not necessarily have renal failure. Dr. Hand believed that there was no way for Dr. Flyte to predict that Toston was going to have kidney failure and need dialysis or surgery.
Dr. Rangaraj testified that the staghorn calculus, creatinine of 3.1 and BUN of 22 told her that Toston was in renal failure. Dr. Rangaraj felt that Conway had received a patient who should not have been at Conway, and that Toston should have been moved to a facility with an active genitourinary (“GU”) staff in house and a nephrologist because she was already in kidney failure when she arrived at Conway. She did not think |22that Dr. Flyte had received a full picture of Toston’s condition from Dr. Hio, and that Toston was not the stable patient that Dr. Hio had made her out to be. Dr. Rangaraj felt that even though Dr. Flyte had some concerns about accepting Toston, he deferred *209 to Dr. Hio because she was running an ER and he was only a doctor in training. Dr. Flyte was apparently reassured by Dr. Hio that Toston looked okay and only needed some antibiotics. Dr. Rangaraj felt that a more senior doctor would have told Dr. Hio that he would not accept the transfer because Conway lacked dialysis and urological capabilities. She would have turned down the transfer because Toston’s condition had the potential to get bad and she would not have been able to give her the help that she needed. By the time she and Dr. Flyte realized Toston’s true condition, they were stuck with her and began looking for somewhere to send her.
Once again, there is a difference of opinion among the physicians as to whether Conway should have accepted the transfer and as to whether it made a difference in the outcome. As a genuine issue of material fact remains regarding whether Dr. Flyte breached the standard of care in accepting the transfer and whether this action affected the outcome, the trial court erred in granting Conway’s motion for summary judgment.
CONCLUSION
The trial court erred in granting a full summary judgment in favor of St. Francis. However, the portion of the summary judgment dismissing the antidumping claims was properly granted. In that regard, we affirm the summary judgment in favor of St. Francis insofar as it dismissed the claim 123that St. Francis violated Louisiana’s antidumping law. In all other respects, the judgment granting summary judgment in favor of St. Francis is reversed. The judgment granting summary judgment in favor of Conway is also reversed.
DECREE
With St. Francis and plaintiffs to bear their own costs, the judgment granting summary judgment in favor of St. Francis is AFFIRMED IN PART and REVERSED IN PART. With Conway to pay appeal costs of $86.00, the judgment granting summary judgment in favor of Conway is REVERSED.

. Dr. Flyte began his residency there in July of 2000.

. This means not only is a bed literally available, but also there is enough staff available to care for the patient.

. Dr. Cage thought the left side was probably totally blocked, but not the right.