CARAWAY, J.
|,This is a medical malpractice action arising out of the death of Annette Toston. After 44-year-old Toston died from complications frorh an underlying kidney infection in November, 2002, her severi children instituted suit for her wrongful death against St. Francis Medical Center and the State of Louisiana (“E.A. Conway” hospital). The trial court determined that St. Francis committed medical malpractice and pursuant to the Medical Malpractice Act, assessed St. Francis with $100,000 in damages and the Louisiana Patients’ Compensation Fund (“PCF”) with. $400,000. The PCF intervened and brings this appeal. For the reasons set forth below, we affirm.

Fads

- -This wrongful death and medical malpractice case-concerns St. Francis’s delay in admitting Annette Toston (“Toston”) into the hospital on November .24, .2002. At the time, while Toston was a patient at E.A. Conway hospital, she needed a surgi *1087 cal procedure which was only available at St. Francis. After she was admitted to St. Francis the. following day for the surgical procedure, she did . not survive. The facts that give rise to this action are set forth, in our earlier decision in Toston v. St. Francis Medical Center, Inc., 47, 529 (La.App.2d Cir.12/17/12), 108 So.3d 197 (“Toston I”).
On remand, the case proceeded to a 3-day bench trial in July 2014, against St. Francis. In its oral ruling-for the plaintiffs, the trial court discussed the nature of the case as follows:
|2The theory of recovery events by the. plaintiff in this case is that St. Francis is allegedly guilty of medical malpractice ... this court agrees, this case is not about the treatment that was given to ..Ms. Toston, this case is about ... the delay in any treatment should the Court find that Ms. Toston was accepted as a patient at St. Francis on the night of November 24, 2002 ... or whether it caused her to lose a chance at-at survival in this case.
The court reviewed the facts and testimony and ruled accordingly:
The Court does conclude as a matter of fact based upon the total testimony, and evidence, both the live testimony as well as the physical evidence that’s been introduced during ,'.. this trial that James Harris, the nursing supervisor on duty on November 24,' '2002, assigned that bed to Annette Toston as the witness indicated that he did, And the Court further concludes as a fact based upon the ’totál testimony and the evidence in this record that there was adequate bed space and staffing to address whatever needs that Ms. Toston or any other patient that was in this SICU until demand or needed at that tithe. The Court further concludes that because St. Francis accepted Ms. Toston as a patient based upon Dr. Cages’ accepting her. as a patient and there being bed space for her that .it — it delayed some fifteen hours or thereabouts ... when you consider the time of the acceptance .around sometime shortly before 7:50. up until the time that she arrived at St.. Francis the day after on November the 25th of 2002 at around 11:25, that’s approximately fifteen hours later, that there was a delay in treating.due to an act or omission on the.part of St. Francis and — and this Court concludes as relates to the standard of care ,.. based on the — the facts and the circumstances of this case and the testimony of the expert doctor witnesses] .,. that the standard of care with regards to the transfer and . i. 'bed[1] assignment has been adequately provided to this Court that elemént of the plaintiffs casé. The next question is having concluded that the plaintiff has proved the standard of care in this, was there a breach’ of the standard of care in the delay that took place after the acceptance of this Ms. Toston as a patient. This Court concludes that there was such a breach in ...’ and "that delay in and of itself that there was a breach and that ... breach was a causal connection to the damages that was suffered by the plaintiff in the case. Now, the question is did that breach cause the death of Ms. Toston or did it cause her to lose a chance at — at survival. This Court finds that it caused her to lose a chance of survival. I think when you weigh and consider the overall testimony it. caused Ms.- — Ms. Toston a loss of a chance of survival and that’s what the testimony convinces- me of.
After this ruling ón liability, the trial court determined ' damages. The court noted that Toston was 44, years old and making around $11,000 a year |awhen she *1088 died and that her seven kids not only lost her income, but also her society, her moral support, and-her spiritual support. Considering the latter, the court concluded that Toston’s children, some of whom were minors, suffered a great loss; The court awarded damages of $600,000 on the basis of its ruling of Toston’s lost chance of survival.
A written judgment followed on July 14, 2014, assessing St. Francis with $100,000 damages and the PCF with $400,000 pursuant to the Medical Malpractice Act (“MMA”). Initially, St. Francis appealed and posted a bond of $162,000, consisting of $100,000 and the remaining judicial interest. Thereafter, the PCF intervened.
Subsequently, plaintiffs entered into a settlement agreement with St. Francis. In the settlement agreement, plaintiffs settled for $100,000, and released St. Francis from liability, reserving all rights to proceed against the PCF. Thereafter, plaintiffs and-St. Francis filed a joint motion to dismiss St. Francis’s appeal, which included a copy of the settlement agreement and a certificate of service that a copy had also been delivered to the counsel for the PCF. The trial court granted the joint order to dismiss. Thus, the PCF is the only remaining defendant and has brought this appeal.

Discussion

I.
Three[1] of six of the PCF’s assignments of error pertain to the trial ^court’s finding of liability on the part of St. Francis. Plaintiffs argue that according to the ruling of the Louisiana Supreme Court in Hanks v. Seale, 04-1485 (La.6/17/05), 904 So.2d 662, the determination of liability in a trial between the malpractice victim and the healthcare provider- precludes the PCF’s challenge in these assignments of error. We agree.
In Hanks, two defendant physicians performed surgery on the plaintiff. Eventually, problems and complications arose as a result of the surgery, and plaintiff was forced to undergo additional surgeries. After the medical review panel issued its opinion, plaintiff filed a medical malpractice claim against the two- surgeons for the initial operation. ■
The matter proceeded to trial, and the jury found in favor of plaintiff, awarding damages over $4,000,000. The district court, pursuant to the MMA, assessed the physicians’ damages of $100,000 plus interest and found the State Treasurer’s Office and the Office of Risk Management liable for the remaining damages subject to the limits in the MMA. After the district court denied their post-trial motions, both doctors chose not to appeal and instead paid the statutory maximum of $100,000 plus interest. Thereafter, the PCF intervened and appealéd.
The Supreme Court granted certiorari to determine whether the PCF was precluded from arguing the liability of the physicians. The court first recognized that the MMA provisions for settlement of liability in advance of trial, La. R.S. 40:1299.44(C), had no application in Hanks. Nevertheless, with the jury trial and the *1089 finding of liability by the two qualified healthcare | ^providers, the court interpreted the overall' MMA provisions, including, most importantly, its limits on the PCF’s rights of intervention into the malpractice suit. The court found' that “the issue of liability is generally to be determined between the malpractice victim and the healthcare provider, either by settlement or by trial, and that the Fund is primarily concerned with the issue of the amount of damages.” Id. at 668, citing Stuka v. Fleming, 561 So.2d 1371, 1374 (La.1990).
The court’s conclusion in Hanks was best summarized as follows:
[W]e cannot interpret the statute to impliedly give the Fund authority to appeal the issue of liability in the case sub judice. To do so would essentially make the Fund a party to the suit, which is contrary to our repeated pronouncement that the Fund is not a party defendant in medical malpractice suits between a claimant and a healthcare provider, and give it a greater interest than we have previously recognised is proper.
Id. at 669.
In brief, the PCF attempts to distinguish Hanks on the basis of the appeal by St. Francis in this case and the PCF’s intervention, both of which occurred before the time óf St. Francis’s settlement for $100,000. Additionally, urging La. R.S. 40:1299(C)(5)(e), the PCF continues to argue that the liability settlement legislatively addressed in that section of the MMA did not occur in this case so that this post-trial settlement does not preclude the PCF from contesting the medical malpractice liability in this appeal.
We reject these arguments because the ruling in Hanks did not rely on the specific pretrial settlement procedure addressed in the MMA. Instead, interpreting the broad context of the overall act, the court found that a | filiability determination through a trial on the merits before any allowance for the PCF’s intervention was binding on the PCF upon the healthcare provider’s later settlement for its initial $100,000 liability for the claim. We do not find the fact distinction between the time of settlement in this case and the Hanks’ settlement relevant so long as the liability issue was foreclosed by the action of the healthcare. provider prior to this appellate consideration.
As áii additional issue concerning liability, the PCF also asserts that the trial court erred in failing to allocate' fault to Willis-Knighton hospital in Shreveport for its refusal to accept the transfer of Toston from E.A. Conway at 1:00 a.m. on November 25, 2002.[2] We note that in St. Francis’s pleadings, it does not specifically allege the comparative fault, of Willis-Knighton. However, the pleadings were expanded because St. Francis argued and presented evidence at trial regarding Willis-Knighton’s alleged negligence. The trial court’s rejection of that argument resulting in the judgment of 100% fault on St. Francis was a part of its ruling on liability which may not be reviewed in this appeal.
Finally, also-related to the trial court’s determination of liability, the PCF asserts that the trial court erred in finding that this court’s previous ruling in Toston I established law of the case. This, according to the PCF, allowed a standard of care to be imposed upon St. Francis which was not supported by expert medical testimony. From the trial court’s ruling above and the record, the court did not proceed under any view that Toston I had ^established law of the case. Aside from that point, the trial court’s determination *1090 of a breach of duty resulting from St. Francis’s delay and refusal to accept To-ston as a patient- on .November -24 is an issue of liability which the ruling in Hanks has now foreclosed.
II.
With liability established, PDF’s next' assignment of error is that the- plaintiffs' did not carry their burden of proof that St. Francis’s breach of the standard of care caused harm to Toston. As we have already held, St. Francis’s settlement agreement is a admission that its breach caused -harm resulting in damages of at least $100,000. PCF’s assignment of error nevertheless can be viewed as its assertion that St. Francis’s breach of the standard of care did not cause harm in excess of $100,-000.
As the Louisiana Supreme Court explained in Hall v. Brookshire Bros., Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, 567:
In the same vein, when a healthcare provider tenders payment of '$100,000.00, thereby admitting and establishing “liability,” that admission of liability is an admission' of fault and causation of damages of at least $100,000.00. It is not an admission of the percentage of fault attributable to the healthcare provider; nor is it an admission as to the extent of the claimant’s damages beyond $100,000.00.
PGF1 contends that the only treatments that St. Francis could provide, which were unavailable at E.A. Conway, were dialysis and the placement of stents. Thus, there was no evidence that the delay in dialysis or placement of stents caused harm that would not have otherwise occurred.' We disagree. "
Dr. Urna Rangaraj, who specializes in the field of internal medicine, and who was the supervising physician at E.A. Conway, described her I «thoughts when St. Francis initially said -it would , accept Toston on the night of November 24,2002, before the 15-hour time delay:-
Q: When you said things would “bo fine,” you were -thinking she would survive?
A: That she was in — -Yeah. That she was in safe hands now and all the things that needed to be doné would-be done, because I had full faith that once it was done, that even though it would have been a rough battle, she would have pulled through. The chances were-now good...
Dr. Patrick L. Flyte, the treating physician at E.A. Conway, had the following exchange with counsel for plaintiffs when discussing Toston’s chances of survival:
Q: And then you’ reached that conclusion 7:00 or 8:00 o’clock p.m. on November 24 after getting Dr. Boyette’s radiological report, did you think if she had that emergency urological surgery to remove the obstructions within a matter of hours, that she would be survive?
A: I believe the possibility of her surviving would be dramatically improved with the immediate surgery.
Dr. Michael R. Hand, who specializes in the field of nephrology stated that if intervention had happened earlier, Toston’s chances would have improved. He also stated that when Toston finally arrived at St, Francis, her chance of survival was close to 0, less than 5%.
Dr. Michael Archie, a nephrology specialist, stated that Toston would have had an improved chance if St. Francis would have accepted her on the night of November 24. He further stated that Toston had-a 30% chance of survival when she arrived at Conway at 11:30 a.m., and less than a 5% chance of survival when she finally arrived at St. Francis.
*1091 From this medical testimony, the trial court ruled that St. Francis caused Toston to lose a chance of survival but did not cause her death. |tlThus, while we. can agree with the PC.F that causation was a difficult issue in this case, the trial court’s ruling addressed causation by its .award for lost chance of survival. -
In Smith v. State. Dept. of Health and Hospitals, 95-0038 (La.06/25/96), 676 So.2d 543, the Supreme Court recognized the right to recover damages for any lost chance of survival and set forth the method of valuation. In Smith, X-rays showed a fast-acting cancer. The patient was released without being told of the findings. When' the patient returned the following year, it was too late. The hospital admitted negligence but asserted that the patient would have-died anyway. The Smith court found that á tort-caused lost chance of survival of any degree is “a distinct compensable injury ..: to be distinguished from the loss of life in wrongful death eases.” Smith, 676 So.2d at 547. The two theories of injury are distinct. They entail different damage calculations. Where the evidence could support either a theory that the defendant’s conduct caused the decedent’s death (making full wrongful death damages appropriate) or a theory that the defendant’s conduct caused, the decedent a loss of a chance of survival, Louisiana law is clear that only one kind of damages or the other may be awarded. A jury may And the defendant liable either for causing the patient’s wrongful death or for causing the patient’s loss of a chance to survive, but not for both. The issue in loss of chance cases is. whether the tort victim lost any chance due to á defendant’s negligence. Coody v. Barraza, 47,732 (La.App.2d Cir.3/6/13), 111 So.3d 485.
In Smith, supra, the Supreme Court set forth the prerequisites to Improve the loss of a less than 50% chance of survival. Plaintiff must show by a preponderance that: (1) the victim had a chance to survive at the time of the professional negligence; (2) the tortfeasor’s action or inaction deprived the victim of all or part of that chance; and, (3) the value of that lost chance.
The manifest error standard of review applies to review of medical malpractice claims. Jackson v. Tulane Medical Center Hasp. and Clinic, 05-1594 (La.10/17/06), 942 So.2d 509. A court of appeal may not . set aside a trial court’s or jury’s finding, of fact in the absence of manifest error or unless clearly wrong. In order to reverse a factfinder's determination, an appellate court must review the record in its entirety and find that a reasonable factual basis does not exist for the finding and further determine that; the record establishes that the factfinder is clearly wrong or manifestly erroneous. Where there are two permissible views of the evidence, the factfinder’s choice. between them cannot be manifestly erroneous or clearly wrong. Where there are contradictory expert opinions regarding compliance with the applicable standard of care, the appellate court is bound to give great deference to the conclusions :pf the trier of fact. Goody, supra. ,.
In order to recover damages in their medical malpractice action, plaintiffs had to establish a breach of the standard of care applicable to St.' Francis and prove that its breach caused Toston’s death or a loss of chance of a better medical outcome or longer survival. The trial court could not find that St; Francis caused Toston’s death by its negligence. Nevertheless, based on the above evidence, we find that the trial court had a reasonable factual basis to determine-.that'. St, Francis’s breach caused Toston the loss of l»a chance of a better outcome or longer survival.
*1092 III.
The PCF has also argued that the evidence was not sufficient to support the $600,000 damage award.
In the determination of general damages, the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), Goody, supra at 492. Reasonable persons frequently disagree about the measure of general damages; therefore, it is only when the award is beyond that which a reasonable trier of fact could’ assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Goody, supra..
In Smith, supra at 548-549; the supreme court stated:
The lost chance of survival in professional malpractice cases has a value in and of itself that is different from the value of a wrongful death or survival claim. (Footnote omitted)— This is a valuation of the only damages at issue — the lost chance — which is based on all of the relevant evidence in the record, as is done for any other measurement of general damages. Allowing the jury to consider all the evidence, including expert medical testimony regarding the percentage chances .of survival, and to value directly the lost chance is more logical than requiring the jury to calculate damages for wrongful death when the physi- . dan’s negligence was not the more probable cause of the death.
The court also noted the distinction between calculating comparative fault damages and loss' of a chance of survival damages:
In the comparative fault context, the jury determines the entire amount of general and special damages actually sustained by the tort victim, which is an amount that would be' awarded in the absence of contributory- negligence. The percentage reduction merely 1 ^implements the law of comparative fault in fixing the tortfeasor’s total obligation. But in the loss of a chance of survival context, the award of damages for this particular loss is the “bottom line” figure. Any theoretical figure representing the amount the claimants would have been awarded if they had been successful., in proving the defendant’s fault , more probably than not caused the loss of the tort victim’s life is . not a concrete figure that can properly be subjected to a reduction because of plaintiffs’ failure of proof. Rather, the jury in a loss of a chance of survival case merely considers the same evidence considered by a jury in a survival and wrongful death action, and the loss-of- , chance jury then reaches its general damages award for that loss on that evidence as well as other relevant evidence in the record.
The loss of any chance of survival is a distinct injury compensable as general damages which cannot be calculated with mathematical certainty. The factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss. The factfinder is allowed to consider an abundance of evidence and factors, including evidence of percentages of chance of survival along with evidence such as loss of support and loss of love and affection, and any other evidence bearing on the value of the lost chance. The factfinder’s verdict of a lump sum amount of damages can be tested on appeal for support in the record '• by reviewing the percentage chances and the losses’incurred by the tort *1093 victim and his or her heirs, and any other relevant evidence, thus providing assurance against speculative verdicts. Smith, supra-, Coody, supra.
PCF argues that Toston could not have had a close relationship with one of her seven children because of her mental and physical conditions and that only three of the remaining children were minors at .the time of her death. PCF further argues that since Toston’s income was less than $10,000 11sa year prior to her death, whatever financial support her seven children were receiving had to have come from sources other than their mother.
Toston’s children were ages, 29, 24, 22, 20, 16, 11 and 9 when she died. Toston never married and raised her seven children alone until the time of her death. The oldest child,' Sylvella, had' a child of her own and sustained severe brain injury in a 1997 accident. She lived' in a local nursing home where Toston had been employed. She was aware of her family and became more withdrawn' and sad' for months after her mother’s death.
The second daughter, Lateea, testified that since her mother’s death, she was required to get the school-age children up and out for school. She worked from 7-3 and then helped the children with homework. She fed them and got them to bed, after which she went to the nursing home to sit with her older sistér until midnight. Lateea had not been living with her mother at the time of her death because she was in nursing school and the National Guard1 since she was 17. Lateea testified that she intended to complete nursing school in 2016 and complete her 20 years of service in the National Guard after deployment to Kuwait in 2015.
Lateea testified that it was her mother’s plan to bring Sylvella home to Monroe and she was- in the process of having a room designed for her daughter after her purchase of a new home. Lateea had been unable to complete her mother’s plans due to her schooling and other responsibilities which were overwhelming. She had been able to move all the other children to the Monroe home. Sylvella’s daughter had graduated from high |uschool with honors and was attending college.
Lateea testified that her mother was close to all of her children. Lateea helped all of them receive education and obtain jobs after their mother’s death. Cordney, 22, got off track after the death of his mother and was in a correctional facility for a marijuana conviction.
Toston’s employer testified that Toston had worked at her nursing home for 15 years until her death; she was a good employee who volunteered for extra shifts. She testified that Sylvella could recognize her mother and siblings and spoke with her eyes by blinking.- Sylvella became depressed after her mother’s death and the employer could tell that all of the children were having a hard time with their mother’s death. The employer saw Toston the day before she went into the hospital and she seemed fine. Additionally, two of Toston’s close friends testified that Toston worked hard for her children and that she and her children had a close relationship.
In all, the trial court heard testimony from four of Toston’s seven children and other witnesses. Reviewing the award of damages in the light most favorable to the plaintiffs, we do not find that the trial court abused its vast discretion in awarding plaintiffs damages in the lump sum amount of $600,000 for the damage to her children in this lost chance of survival case.

Conclusion

For the reasons expressed above, the judgment of the trial court is affirmed. *1094 Costs' of this appeal are assessed to the POF. '■
AFFIRMED.

. Assignment of Error # 2. The trial court erred in finding, as a matter of fact and law, that Ms. Toston became a patient of SFMC on November 24, 2002, at 7:50 p.m.
Assignment of Error # 3. The trial court erred when it found that appellees carried their burden of proof establishing the standard of care owed by SFMC and that it breached that standard of care in regards to the potential transfer from Conway on November 24,-2002, at 7:50 p.m., or thereafter.
Assignment of Error # 5. The trial court erred in failing to allocate fault to Willis-Knighton for accepting and then declining Ms. Toston’s transfer.

. See Toston I at 108 So.2d at 201.